THE NEW HAVEN SAND BLAST COMPANY *vs.* CHARLES A. DREISBACH.

Third Judicial District, New Haven, January Term, 1925.

WHEELER, C. J., BEACH, CURTIS, KEELER and HAINES, Js.

A covenant by the defendant to convey to the plaintiff, a corporation organized to exploit a machine patented by him, "every and all patents or patent rights" which might thereafter be "issued" to him, covering future improvements, included an application for a patent upon an improvement invented by two of the defendant's employees and assigned by them of record, at his direction, to a trustee, which immediately executed an unrecorded assignment to the defendant of the sole and exclusive right to make, use and sell the improvement throughout the United States except in the State of Florida; and the trial court properly decreed that the defendant convey to the plaintiff all his interest in the application.

New Haven Sand Blast Co. *v.* Dreisbach.

In view of the finding that the assignments from the inventors to the trustee and from the trustee to the defendant were wholly without consideration, it was not necessary to make the trustee a party to this action.

The obligation of a covenant for future conveyances in a patent assignment is not impaired by the subsequent execution of a shorter form of assignment, omitting such covenant, where it is found that the latter assignment was executed merely to make a record in the patent office of the transfer of title to the patent assigned.

To secure the effectiveness of its decree pending the appeal to this court, the trial court properly ordered the defendant to take all necessary steps, under the rules of the patent office, to keep the application alive and unimpaired.

The decree issued by the trial court perpetually enjoined the defendant from making, using or selling the patented machines or any improvements thereof. *Held* that the decree should be modified to permit the defendant to exercise the privileges common to the public at large, viz., to make ordinary repairs and replacements upon the machines and improvements during the life of the patent and, after its expiration, to make, use and sell them.

The decree also perpetually enjoined the defendant from obtaining for himself any patent or patent rights relating to improvements in the original machine. *Held* that this was erroneous, since the propriety of the defendant's acquisition and retention of a patent would depend upon whether it was within the terms of his covenant—a question which could be decided only if and when it arose.

It further appeared that the existence of the improvement was never communicated to the plaintiff by the defendant, who was its president and a director, and that for a period of more than six months prior to his resignation, he solicited and obtained orders for the manufacture and sale of the improvement by another company of which he was virtually the owner. *Held* that, viewed in the light of his contract obligation to convey his interest in the improvement to the plaintiff and in the further light of his attempt to evade this obligation by the unrecorded assignment from the trustee and by his secret assent to a default judgment against the plaintiff in a collusive action brought by one of his associates for a judicial declaration that such obligation was nonexistent, this conduct was a violation of his official duty to promote the best interests of his company and justified the action of the trial court in ordering him to account for the profits which he derived from his secret competition with the plaintiff.

New Haven Sand Blast Co. *v.* Dreisbach.

The defendant claimed that the complaint described him as the sole or joint inventor of the improvement and that, therefore, there was no basis for the decree ordering the conveyance of the application to the plaintiff, under the rule that an application for a patent is void unless filed and sworn to by the inventor or by all the joint inventors. *Held* that this claim was without merit, since the pleadings, reasonably construed, were consistent with the evidence which showed his employees to be the sole inventors.

The admission of unimportant evidence, otherwise unobjectionable, will rarely be held to constitute harmful error merely because it is irrelevant and immaterial.

It is not essential for a plaintiff to establish all the allegations of his complaint, it being sufficient if he proves enough to sustain the judgment sought.

In common law actions of account based on contract, demand and refusal must be alleged and proved; but it is otherwise in suits of an equitable nature, such as the present case.

Argued January 23d—decided March 10th, 1925.

SUIT for an injunction to restrain the alleged violation by the defendant of his agreement to transfer to the plaintiff certain patents and patent rights, for a mandatory injunction to compel the performance of said agreement, for an accounting of profits alleged to have been earned by the defendant from his breach of said agreement, for certain other equitable relief, and for damages, brought to the Superior Court in New Haven County and tried to the court (*Brown, J.*); judgment for the plaintiff, and appeal by the defendant. *Error in part and cause remanded.*

The following facts are found: On February 1st, 1910, letters patent of the United States for a "Radial Sand Blast Barrel," invented by the defendant, were issued to him jointly with one William J. Smith. In looking for capital to exploit the invention these two agreed to convey a one-third interest in the patent to Clarence E. Billings, who induced George A. Nash, of Boston, to agree to invest $5,000 in the capital stock of a corporation to be formed for the purpose of ex-

ploiting the invention, on the understanding that all papers relative to the validity of the patent and the organization of the corporation should be submitted for his approval. The plaintiff corporation was incorporated in April, 1910, by the four stockholders above named, each of whom subscribed for fifty shares of a par value of $100 each. Dreisbach, Smith and Billings, in full payment for their subscriptions, assigned to the corporation the patent, valued for that purpose at $15,000, by a writing, Exhibit A, and Nash paid cash for his stock in full. Soon after, Smith sold his stock to Clarence H. Billings, a relative of Clarence E. Billings, and, in September, 1911, each of the four stockholders transferred ten shares of stock to Alfred E. Hammer; since when there have been no stock transfers down to the date of the trial. Exhibit A contains a covenant for the future conveyance of any patents or patent rights covering improvements in the patented machine or machines of a similar nature. The defendant was a director and the president of the plaintiff corporation at all times down to February 10th, 1920; he also acted as general manager from the beginning, and was formally elected to that office in 1917 and so continued until February 10th, 1920. The plaintiff corporation did not itself manufacture the patented sand blast barrels, but confined its business to selling and creating a market for them. Until July, 1917, they were manufactured for the plaintiff by one MacKenzie, and after that date by the Standard Equipment Company, a concern conducted by the defendant under that trade name. In 1918 one Washburn, employed by the defendant's Standard Equipment Company and familiar with the plaintiff's sand blast barrel, called the defendant's attention to an improvement in sand blast barrels conceived by him. Not long before this, in 1917, an action had been instituted

against the plaintiff corporation in the name of William J. Smith, one of the parties to Exhibit A, claiming that the covenant for future conveyances contained in that instrument had been inserted therein by mistake, and asking for the reformation of the instrument by the elimination of that covenant. This action, the court finds, was instigated by the defendant. The defense to that action was controlled by the defendant, as president of the plaintiff corporation; and it resulted in the execution of a stipulation for a judgment reforming Exhibit A by eliminating the covenant for future conveyances. Such a judgment was rendered in June, 1919, without the knowledge or consent and against the previously expressed desires of the other directors and officers of the corporation. After the entry of this judgment, the defendant financed the reduction to practice of Washburn's suggested improvement and the application of a patent therefor in the names of Washburn and of one Sheldon, another employee of the Standard Equipment Company, as joint inventors. This application was assigned by Washburn and Sheldon to the Broadway Bank & Trust Company, with request that the patent be issued to the assignee, and at the same time the Bank executed a paper assigning to the defendant all its right, title and interest in and to the improvement and in and to any patent that might be issued thereon throughout the United States except the State of Florida.

The first of these assignments was recorded in the patent office, and the second was not. Both of them were made without any consideration whatever, and for the purpose of putting the apparent legal title to the patent, when issued, in the Bank, and at the same time giving the defendant the beneficial ownership of the monopoly.

The Washburn-Sheldon barrel is a substantial im-

provement on the Dreisbach barrel, in that it is better adapted to the treatment of larger castings; and it is commercially a competitive machine.

The defendant, while still president and general manager of the plaintiff corporation, entered upon the manufacture and sale of these Washburn-Sheldon barrels and solicited and accepted orders therefor.

Some time in 1920 the plaintiff moved to reopen and set aside the judgment in the Smith suit above mentioned, for lack of notice, and that judgment was set aside without opposition. The Washburn-Sheldon barrel is an improvement on the Dreisbach barrel within the meaning of the covenant for future conveyances thus reinstated in Exhibit A.

In December, 1919, the defendant, under the name of the Standard Equipment Company, wrote a letter to the plaintiff, notifying it that on January 1st, 1920, the Standard Equipment Company's price for manufacturing the Dreisbach barrel would be increased fifty per cent. This letter was received by the defendant himself as president of the plaintiff corporation and in that capacity he assented to such increased price; but the defendant did not increase the selling price of the barrel to the plaintiff's customers. The result was that the defendant, who was at that time also acting-treasurer of the plaintiff, paid himself the increased price on six barrels which the plaintiff sold at a loss. This was done without notice to or knowledge of the other directors or officers of the plaintiff; but was done at a time when the defendant knew that he would shortly be deposed from his position as president and general manager of the plaintiff corporation.

The complaint was originally in five counts, of which the third and fourth have been abandoned. The first count is based on unfair competition in that the defendant, who was controlling the plaintiff's business in

a fiduciary relation, secretly entered into a competing business to the plaintiff's injury. The second count is for specific performance of the covenant for future conveyances in Exhibit A, as applied to the Washburn-Sheldon application. The fifth count is to recover the profit made by the defendant by reason of his undisclosed increase in the cost price of six barrels.

The defendant's answer may be summarized, for the present purpose, as follows: To the first count, a denial of fiduciary relationship to the plaintiff in respect of the Washburn-Sheldon barrel; and a denial of competition while the defendant was an officer of the plaintiff corporation. To the second count, that the covenant for future conveyances in Exhibit A was inserted therein by mistake and without consideration; that Exhibit A has been superseded by a second assignment, hereafter called Exhibit R, and that Exhibit A is null and void. To the fifth count, a denial that the profits sought to be recovered were obtained by any violation of duty, or that the defendant was under any fiduciary relation to the plaintiff, or that the profits themselves were secret or unconscionable. The defendant also counterclaims for damages on the ground that the plaintiff refused to accept and pay for certain barrels constructed by the Standard Equipment Company upon orders received from the plaintiff; and for a decree that Exhibit A be cancelled, or reformed by eliminating therefrom the covenant for future conveyances.

The trial court found all the issues for the plaintiff and rendered judgment (1) that all rights as to the defendant and those in privity with him, including the Broadway Bank & Trust Company, in the Washburn-Sheldon invention and the application for a patent therefor, are held in trust for the plaintiff; (2) that the defendant, his servants and agents, etc.,

and the Broadway Bank, do forthwith all that is necessary to transfer and insure to the plaintiff all rights in the Washburn-Sheldon invention and in the application for a patent therefor. Paragraphs three, four and five of the judgment contain additional and more specific directions in aid of paragraph two; (6) perpetually enjoining the defendant and all in privity with him, from making, using and selling any finished or unfinished Dreisbach or Washburn-Sheldon sand blast barrels and all parts thereof; (7) perpetually enjoining the defendant, etc., from making, using or selling any improvement on the Dreisbach barrel, or machine of a similar nature; (8) perpetually enjoining the defendant, etc., from acquiring patents or patent rights in such barrels for the use of any other person than the plaintiff; (9) that the defendant account to the plaintiff for profits derived from the sale of the Washburn-Sheldon barrels up to the date of the decree and for the plaintiff's damages arising out of said sale; (10) that, upon the fifth count of the complaint, the plaintiff recover of the defendant $1,425.42, with interest to the date of the judgment.

The defendant's reasons of appeal, which include many assignments of error for refusal to correct the findings, are so many and stated in such detail that it would serve no purpose to rehearse them. The appellant's claims can be better understood by following the points made in his brief.

*George E. Hall* and *Walter J. Walsh,* with whom was *Matthew H. Kenealy,* for the appellant (defendant).

*Edmund Zacher* and *Henry E. Rockwell,* for the appellee (plaintiff).

BEACH, J. The defendant's first and fourth contentions are that Exhibit A is null and void because

the original contract, Exhibit A, does not conform to the antecedent negotiations for the sale of the Dreisbach patent to the plaintiff as evidenced by the records of the corporation, in that there is no mention in those records of a covenant for future conveyances; and, further, because it is claimed that Exhibit A was restated and superseded by the subsequent execution of Exhibit R, which is a second written assignment of the patent to the plaintiff, not containing the covenant for future conveyances.

The first reason given is manifestly insufficient unless, as a matter of fact, the covenant for future conveyances was inserted by mistake and was not agreed to by the assignors; and on that point it appears that there was no opportunity at all for fraud and almost none for mistake, because the assignors, Dreisbach, Smith and Billings, were also the directors and officers of the plaintiff, assignee. As directors of the assignee they voted to buy the patent and instructed plaintiff's attorney to prepare "a proper bill of sale." Pursuant to this vote Exhibit A was prepared and they signed it, as assignors of the patent. Then the defendant, as president of the assignee, reported that a proper bill of sale had been executed, and the three directors, acting for the assignee, accepted the contract which they had just signed as assignors. The Superior Court has found that, before Dreisbach signed Exhibit A, the entire instrument was read aloud to him; that when Mr. Hammer purchased his stock, in September, 1911, he inquired of the respondent whether subsequent improvements would accrue to the benefit of the company, and the respondent, referring to Exhibit A, replied, "Yes, there's my agreement by which the company will get the benefit of any such." And finally the court finds that Dreisbach, Smith and Billings understood and knew the contents of Exhibit A and knew

that they could not obtain capital to promote the purposes of the company unless Exhibit A contained a covenant covering future improvements. These findings are not excepted to and they seem to put an end to any claim that the covenant was inserted in Exhibit A by mistake.

The court has also found that the second assignment, Exhibit R, was not executed with intent to supersede or to rescind Exhibit A, or the covenant for future conveyances contained therein. And this finding the defendant does attack in his assignments of error, but the conversation above noted between Mr. Hammer and the defendant is enough of itself to support the finding of the court, so far as the defendant is concerned. Moreover, it does not appear that there is any mention of Exhibit R on the corporate records of the plaintiff or any record of any action taken inconsistent with the status created by the original acceptance of Exhibit A.

Exhibit R had its origin in the fact that Mr. Nash sent an attorney from Boston to see that all legal formalities necessary for the protection of his investment were complied with; and as the result of this attorney's inspection of the records, some changes were made in the certificate of organization and in the minutes of the stockholders' meetings. It was then discovered that no written evidence existed of Billings' ownership of his alleged one-third interest in the patent, and an assignment was executed from Dreisbach and Smith to Billings, for the purpose of curing that defect. Although there is no specific finding on this point, it appears from an inspection of Exhibit A that it does not, in terms, convey the legal title to the patent to the plaintiff. The entire beneficial interest is, however, conveyed in terms which would entitle the plaintiff to an explicit assignment of the legal title, and,

under all the circumstances, the only reasonable inference is that Exhibit R was executed solely to perfect the transfer of the legal title to the plaintiff and to make a record in the patent office of that title in terms free from uncertainty. The finding of the court that Exhibit R was merely a formal assignment executed for recording purposes is fully supported by the subordinate facts.

Points two and three on the defendant's brief attack the validity of the decree of specific performance of the contract for future conveyances, first, on the ground that the rights of third parties were involved, who were not parties to this action, namely, Washburn and Sheldon and the Broadway Bank & Trust Company. It is, however, found that Washburn and Sheldon have assigned all their rights, title and interest to the Broadway Bank. Apparently they have none left, and none is suggested on the brief, except the possibility that the defendant may have induced them to part with their interest in ignorance of their rights and without consideration. Obviously the defendant cannot shelter himself behind that possibility. Besides, the action is *in personam* and the plantiff gets no title better than the defendant and his servants and agents can give.

As to the Broadway Bank, the finding is, in effect, that it is merely the apparent custodian of the legal title, for the use and benefit of the defendant, and that it neither gave any consideration for the recorded assignment to itself nor received any for its contemporaneous unrecorded assignment to the defendant. Upon these findings, we think it is shown to be merely a custodian for the defendant and may be treated as such in the decree. Of course, the Broadway Bank is not concluded by these findings made in an action to which it was not a party; and if it is not in fact a mere custodian for the defendant, of the rights assigned to

it by Washburn and Sheldon, it will have the right to assert such independent rights as it does possess in any proceedings which may be brought to compel it to comply with the terms of the decree.

The other phase of the claim that the court erred in decreeing specific performance, rests on the language of the covenant for future conveyances: "We, each for himself, hereby further agree to convey to said company every and all patents or patent rights which may be issued to us, or any of us, hereafter by the United States of America covering any improvement on said machine or machines of a similar nature which may be patented by us hereafter." It is said that this language must be strictly construed; and that it requires two things, first, the absolute necessity of an issue by the United States of a patent or patent right, and second, that such issue should be to the defendant. The defendant's claim is that the United States has issued no patent or patent right to the defendant.

In the first place, there is no rule of law which requires that contracts should be strictly construed. The oft-repeated rule is that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words in the light of the circumstances surrounding the execution of the writing and in the light of the object of the parties in executing the contract. Here the parties had already agreed to form, and had just completed the formation of, a corporation for the purpose of exploiting the Dreisbach patented sand blast barrel. There were four stockholders, Dreisbach, Smith and Clarence E. Billings, who owned the patent, and Nash, a banker, who furnished the only money put into the business. Dreisbach was an inventor, and all except Nash were manufacturers. "Under these circumstances," as we said of a similar contract (*Birkery Mfg. Co.* v. *Jones*, 71 Conn. 113,

121, 40 Atl. 917), "it was in the power of Birkery and Jones (in this case, Dreisbach, Smith and Billings), by subsequent inventions and improvements . . . to practically destroy the business of the corporation. This is what Standish [Nash] evidently feared, and it was mainly to guard against this that the [original] written agreement was executed." So much for the evident object of covenants for future conveyances which are commonly found in contracts of this kind, made to obtain capital for the exploitation of patented devices.

Turning now to its language, we must suppose that the phrase "every and all patents and patent rights which may be issued to us," etc., was intended to include something more than the patents only; and the controversy as to the proper construction of the covenant centers upon the meaning to be given to the term "patent rights" and to the word "issued." Standing alone or in the context in which they are usually found, the term "patent rights" ordinarily refers to rights arising under patents already issued, such as licenses to make, use or sell the patented invention, or grants of some interest in the monopoly less than the absolute and undivided legal title to the patent itself. But here the context shows that the reference is to patent rights "which may be issued to us, or any of us, hereafter by the United States," and this must include rights to be issued in connection with future patents.

Again, if the word "issued" is taken in its technical patent office sense of a formal grant by publication and delivery, the term "patent rights" will have no meaning at all, for no patent rights are issued in that sense by the United States. The United States does, however, grant to or confer upon an inventor the right to apply for a patent, which application is assignable, and the right—which is also assignable to others—to prosecute such applications and to receive any patent

which may be granted thereon. These rights may be said to be issued by the United States in the sense that they are granted by or conferred by it or issued from it. They are also rights which may properly be described as rights "covering" the improvement for which the patent is sought.

We think that when the term "patent rights" is plainly intended to include rights arising in respect of future patents upon an improved machine and is so used in a covenant to convey every and all such patents or patent rights covering such improved machine, the covenant may well be intended as an agreement in the alternative to convey any such patent or an application for such patent.

And so we think that the proper construction of this covenant, from a technical point of view, is narrowed down to the single question whether, in the phrase "issued to us, or any of us, hereafter by the United States," the word "issued" must be given the technical sense already noted, which, as the findings and the defendant's claims demonstrate, may defeat the entire covenant for the conveyance of future patents as well as patent rights; or whether that word may be construed in its larger sense as meaning granted, conferred, or issuing from, and thus the whole phrase construed as referring rather to the source from which the patent right is derived rather than the act of granting it in any particular manner and form. This latter view is supported by the paragraph next following the covenant in question, for it provides that "no foreign rights in or under said patent or in or under any improvement upon said machine or patent or patents upon other similar machines which may be granted to any or all of us are conveyed or intended to be conveyed by this instrument to the said The New Haven Sand Blast Company." It will be noted that in

this part of the instrument the word "granted" is used instead of the word "issued."

It thus appears that Exhibit A purports to define the subject-matter of the covenant for future conveyances in terms which are both inclusive and exclusive; and by thus describing what portion of the subject-matter lies on either side of the dividing line, it purports to deal with the subject-matter comprehensively. When, therefore, we find that the language excluding foreign rights from the covenant very plainly covers foreign applications for patent, we may infer from that fact also that the ambiguous language in which United States rights are included in the covenant was probably intended to cover applications for patents in this country. And finally, unless the words "patent rights" include rights arising in connection with applications for patents, the whole covenant for future conveyances may be evaded in the manner in which the defendant has attempted to do so. For the several reasons indicated, we are of the opinion that the trial court did not err in holding that the covenant in question includes the Washburn-Sheldon application in controversy.

The fifth, sixth and seventh points on the defendant's brief attack the conclusions of the court that the defendant occupied a fiduciary relation toward the plaintiff, and stood in the position of a constructive trustee with reference to the Washburn-Sheldon application.

These questions are discussed upon the defendant's brief upon the assumption that no express contract obligation existed on the part of the defendant to convey the Washburn-Sheldon application to the plaintiff. Inasmuch as we have determined that the defendant was and is under an express contract obligation to convey that application to the plaintiff, the questions now under consideration have lost a good deal of the im-

portance which the defendant's brief attributes to
them. In the light of this determination their applica-
tion is limited to that portion of the decree which
requires the defendant to account for profits and dam-
ages arising out of the competitive business in which
the court finds that the defendant was engaged at
the time when he was president and general manager
of the plaintiff corporation, and, we may add, was
also under contract to convey the Washburn-Sheldon
application to the plaintiff; for, having once determined
that obligation to exist, we cannot shut our eyes to it
in any discussion of the legal or equitable relations
between the plaintiff and the defendant. The existence
of this contractual obligation which the defendant's
brief and argument, on this branch of the case, assume
to be nonexistent, necessarily destroys the force of most
of the argument on behalf of the defendant under these
two points, for, in our judgment, it narrows the ques-
tion down to the point whether the findings of the
court to the effect that the defendant made and sold
Washburn-Sheldon barrels during the time he was also
president and general manager and director of the
plaintiff company are supported by the evidence. If
they are, the conclusion that the defendant, who was
also under contract obligation to convey the Washburn-
Sheldon application to the plaintiff, could not fairly
manufacture and sell such barrel in competition with
the plaintiff without its consent or acquiescence, would
seem to be irresistible.

It is undoubtedly true that the public, or any person
having the necessary knowledge or information, fairly
acquired, may manufacture the Washburn-Sheldon
barrel up to the time when the patent issues, if it does
issue. But it does not follow that the president and
general manager of the corporation has the right to
do so in competition with the corporation whose best

interests he is bound to protect by virtue of his office. Still less may he do so, when also under a contract obligation to convey the application and all rights thereunder to his corporation. Still less may he do so when, as in the present case, it is found that he has used his office as president and general manager in an attempt to evade his contract obligation by assenting to the judgment in the Smith suit, and by again attempting to evade it by making it appear that the ownership of the Washburn-Sheldon application was in the Broadway Bank & Trust Company, when it is found as a fact that the Bank was acting merely as a custodian for the defendant himself.

The findings show that the defendant held his office as president until February 10th, 1920; and that the construction of the Washburn-Sheldon barrel was commenced in the defendant's Standard Equipment Company factory in July, 1919, the first barrel being delivered to a customer on March 1st, 1920. On October 31st, 1919, the defendant quoted prices on four such barrels to another customer, which resulted in orders dated November 14th and November 18th, 1919, and thereafter accepted.

It is also found that none of the stockholders or directors of the plaintiff company, other than the defendant, knew of the existence of the Washburn-Sheldon barrel until some time in March, 1920.

These findings are enough to show that defendant's competition commenced to some extent in the fall of 1919; and that is enough to justify the decree for an accounting of defendant's profits and plaintiff's damages.

Under point nine of the brief, defendant claims that the judgment on the fifth count was erroneous because it appears that the plaintiff ratified the action of the defendant in raising the cost price of the Dreisbach

barrel.  The claimed ratification consists in continuing, after February 10th, 1920, to require Dreisbach to supply barrels under his contract with plaintiff and in continuing to pay the increased cost price.  Dreisbach had a right under the terms of his contract to increase the cost price of the barrels.  In so doing he was acting for himself, and not as agent of the plaintiff company. The gist of the fifth count is not simply that Dreisbach raised the price, but that, having done so, he failed to perform his duty, as president and general manager of the plaintiff, to protect it from loss occasioned by his own acts, or, under the special circumstances of this case, to at least notify the other officers or directors of the corporation that the price had been advanced.

The plaintiff was required by its contract to continue to pay Dreisbach the increased price, but there is no finding that it continued to sell barrels at less than cost after February 10th, 1920, when it first acquired knowledge of the facts; and hence no basis of fact for the claimed ratification of Dreisbach's breach of duty.

Under the same heading the defendant pursues his assignments of error relating to the admission in evidence, over his objection and exception, of two letters, Exhibits O-1 and P-1.  The former is from William J. Smith to Nash, referring to Exhibit E, which is the agreement between Smith and Nash stating the terms upon which the latter agreed to pay $5,000 for his interest in the corporation.  This letter was written the day after the first meeting of the corporation, and acknowledges receipt of Exhibit E, also receipt of $5,000 under its terms, and promises to forward the papers which, by the terms of Exhibit E, were to be submitted for Nash's approval.  Exhibit P-1 is a letter to Nash from his attorneys, approving the by-laws of the plaintiff corporation, observing that there is noth-

ing to show that the organization of the corporation was properly carried out, and advising inquiry as to whether the transfers of patents to the company have been properly executed and recorded. The only objection is that the letters are immaterial and irrelevant. That is a question which it is often difficult for a trial court to determine at the stage of the case when the objection is made; and it is not often that the admission of evidence otherwise unobjectionable will be treated as harmful error. While these letters are not of any great importance, they are not wholly irrelevant or immaterial, because they relate to what was done in pursuance of Exhibit E, which was already in evidence.

Point ten is that neither the pleadings nor the evidence justify the conclusion that the defendant acquired any adverse interest in the Washburn-Sheldon barrel. Broadly stated, our conclusion that the Washburn-Sheldon application is covered by the covenant for future conveyances in Exhibit A, refutes this claim. It is, however, presented in another light as a necessary consequence of the complaint itself. Paragraph twelve of the second count, after alleging that the Washburn-Sheldon barrel is the subject of an application for letters patent in the names of Washburn and Sheldon, alleges: "That such improvements, if not made solely by the defendant herein, were made by the said Washburn and the said Sheldon as participants with defendant, and were in any case instigated and developed and fostered and controlled and supervised by the defendant; but defendant, in violation of his duty to preserve plaintiff's rights in the premises, and in breach of his trust as an officer of plaintiff, and in breach of his contractual duty arising from the contract referred to in paragraph 8 herein and marked Exhibit A, failed to file an application for letters patent in his

own name, or to join as co-inventor with the said Washburn and the said Sheldon in making the application for the benefit of plaintiff, and avoided having his name appear in connection with the patent application and papers relating thereto, either as applicant or assignee, so as to deceive and injure plaintiff; and defendant, further, in violation of plaintiff's rights, caused the said application for letters patent to be transferred secretly to The Broadway Bank & Trust Company, a corporation organized under the laws of the State of Connecticut and having its office and principal place of business in the city, town and county of New Haven, said State, by a secret trust agreement, as trustee for the benefit of the defendant herein."

It is contended that this is in substance a direct averment that Dreisbach was either the sole inventor or a joint inventor with Washburn and Sheldon, and hence an averment that the application filed by and supported by the oath of Washburn and Sheldon is, in either alternative, a void application upon which no patent can lawfully be issued under the Patent Act, which requires every application to be filed and sworn to by the inventor or by all the joint inventors. Defendant relies on *Kennedy* v. *Hazelton,* 128 U. S. 667, 9 Sup. Ct. 202, in which a bill for specific performance of a covenant to convey future patents for improvements made by the defendant in steam boilers, alleged that the defendant did invent such an improvement, and, with intent to evade his obligation, procured a patent therefor to be obtained upon the application of a third person. The bill was held bad on demurrer because, on the showing made by the bill and admitted by the demurrer, the patent was invalid and conferred no title which the defendant could convey.

In the case at bar, "so much of paragraph 12 as alleges that the Washburn and Sheldon invention is

the subject of an application for letters patent of the United States filed in the name of said Washburn and Sheldon is admitted. The remainder of said paragraph is denied." It does not appear that any evidence was introduced tending to show that Dreisbach was the inventor or a joint inventor of the Washburn-Sheldon barrel and the testimony of Sheldon very clearly shows that he was not; the finding refers to Washburn and Sheldon as the "inventors" and to their "disclosure" of the improvement to the defendant, and the judgment repeatedly describes the improvement as the "Washburn and Sheldon invention." Thus, if it were so that the complaint had alleged, without qualification, that Dreisbach was either the sole, or a joint, inventor of the subject-matter of the application, it would appear that the defendant, by denying that allegation, had laid a foundation in the pleadings upon which a judgment consistent with the validity of the application filed in the names of Washburn and Sheldon, might stand. And we also think that the allegation that the improvements, "if not made solely by the defendant herein, were made by the said Washburn and the said Sheldon as participants with defendant, and were in any case instigated and developed and fostered and controlled and supervised by the defendant," is broad enough, in view of its last qualifying phrase, to be consistent with proof of a joint invention by Washburn and Sheldon alone; and, further, that the charge that the defendant fraudulently failed to file an application, either in his own name or as co-inventor with Washburn and Sheldon, does not apply to the situation contemplated by the phrase beginning with the words "and were in any case instigated," etc.

Under point eleven the defendant claims that the plaintiff is not entitled to a judgment because it has failed to prove the essential allegations of the com-

plaint, and the brief maintains that proposition by reference to a number of selected allegations which, it is said, the court has not found to be true. For the reasons already stated, we are of opinion that, with one qualification hereafter made, the facts found are sufficient to support the judgment rendered, and the plaintiff is not bound to go any further than that in its proof of facts alleged. It is therefore unnecessary to follow the defendant's claims in detail under this heading. Many of them are based on claims of law and fact which have been already disallowed. We are unable to find any instance of an allegation essential to the validity of the judgment which has not been found true by the trial court.

It is also contended that in the absence of any allegation in the complaint of a demand for an accounting and refusal to account, no accounting can be decreed. This is not a common-law action of account based on contract; in which it is usual to allege a demand and refusal to account as a basis for the demand for damages. It is a bill in equity asking that an account be taken, and the right to the equitable relief demanded does not depend on a demand and refusal, but upon the facts alleged and proved. In such actions it is not usual or necessary to allege a demand and refusal. No allegation of a demand for an accounting is necessary, for example, to support a prayer for an accounting of profits and damages in a bill for infringement of patent, or copyright, or trademarks, or trade names, or unfair competition based on imitative labels or packages, as will appear from reference to any standard collection of forms for such bills. The practice in this State is illustrated by the printed record in *Chamberlain* v. *Hemingway,* 97 Conn. 156, 115 Atl. 632.

The defendant's claim under point twelve is that the

decree is broader than the law allows. Several propositions are relied on:

*A:* That there is no warrant in the complaint for a mandatory injunction. This has reference to that provision of the injunction which requires the defendant, his agents and attorneys, and the Broadway Bank & Trust Company to do what is necessary to fully transfer and insure to the plaintiff all rights under the Washburn-Sheldon application. This provision is incidental to the decree for specific performance of the covenant to convey, and is intended to prevent a total or partial voluntary abandonment or a forfeiture of the application under the rules of the patent office requiring an applicant to respond to any action or ruling of the examiner in charge of the application within a time limited. We have no doubt that the Superior Court had power to make its decree for specific performance effectual, by requiring the defendant to keep the application alive and unimpaired by any act or omission of the defendant pending this appeal. In this connection the suggestion is repeated that the Broadway Bank is not a party to the action, and that it cannot comply with the decree requiring it to convey all rights in the application to the plaintiff, because it has already assigned most of its rights to the defendant. We have already pointed out that, on the findings, the Broadway Bank has no beneficial rights in the application: It is admitted that the original assignment was delivered to the bank upon some undisclosed parol trust, partly executed, no doubt, by the contemporaneous reassignment of practically all the beneficial rights under the patent, if and when issued, to the defendant. Apparently the Bank still retains the right to have the patent issued in its name, and in that event would still retain the right to make, use and sell the improvement in the State of Florida. These

New Haven Sand Blast Co. *v.* Dreisbach.

rights it can convey, and any others which it has under the undisclosed trust.

*B:*   It is objected that the defendant is perpetually restrained from making, using or selling any radial blast barrel or parts thereof.   We are of opinion that the terms of the injunction in paragraph six of the judgment are too broad.   The plaintiff is entitled to a conveyance of the application, and to the use and enjoyment of the monopoly granted by any patent which may be issued thereon, free from any competition by the defendant before or after the grant of the patent. Upon complying with these conditions the defendant will have performed all his contract requires him to do.   When the patent expires the public, including any assignor of the patent, may make, use and sell the patented improvement.   Furthermore, it is permissible during the life of the patent for any person, including an assignor of the patent, to make repairs upon a patented machine by replacing such parts as may break or wear out in ordinary use during the expectancy of life of the machine itself, provided such replacements do not amount to a virtual reconstruction of the machine.   We are of opinion that the plaintiff's rights as owners of the application and of any patent that may be granted thereon will be sufficiently protected by substituting for the sixth and seventh clauses of the decree an injunction restraining the defendant from making, using or selling any radial blast barrel or parts thereof which are described in the Washburn-Sheldon application, giving its date and serial number, pending the issue of any patent thereon, and from making, using or selling any radial blast barrel or parts thereof which are described and claimed in any patent of the United States which may be issued thereon, during the term of such patent or of any reissue or extension thereof, or from otherwise infringing or contributing

to the infringement of such patent, re-issue, or extension.

*C:*   The defendant also complains that, in paragraph eight of the judgment, he is perpetually enjoined from obtaining for himself in the future any patent or patent rights relating to improvements in the original Dreisbach barrel.  It is pointed out that this would prevent the defendant from buying at any time in the future such a patent issued to any third person; and we think it must be conceded that Exhibit A does not purport to prevent the defendant from acquiring for his own benefit patents issued to third persons; but only such patents and patent rights covering improvements on the original Dreisbach invention as are issued to the defendant within the meaning of Exhibit A as we have construed it.  We are of opinion that the question whether any patent or patent right which the defendant may hereafter acquire, equitably belongs to the plaintiff under the terms of Exhibit A, should be disposed of on its merits when the question arises, if it ever does arise, and that the judgment should also be amended by erasing from paragraph eight so much thereof as now follows the words, "enjoined from further breach of the covenant of Exhibit A in this action."

The thirteenth point on the defendant's brief criticizes the finding of the trial court that the defendant offered no evidence in support of count one of his counterclaim.  We cannot find any evidence tending to prove the essential allegations of this count, which is based on the alleged refusal of the plaintiff to accept and pay for two barrels constructed by the Standard Equipment Company for the plaintiff, under the contract before mentioned.  We are referred to none, except the testimony of the defendant's bookkeeper, who testified, in another connection, that the defendant's

books showed a balance due from the plaintiff. This has no tendency to prove a refusal to accept and pay for the barrels described in the counterclaim.

The fourteenth and last point on the defendant's brief covers assignments of error based on alleged findings by the trial court of material facts without any evidence, and of refusals to find material and undisputed facts aggregating one hundred and forty-two such items. We cannot, of course, review these assignments—all of which are insisted on—in this opinion. We have, however, examined them all in the light of the briefs on both sides, and of such references to the testimony as appear, and find no error.

There is error in part, and the cause is remanded with direction to amend paragraphs six, seven and eight of the judgment in accordance with this opinion.

In this opinion the other judges concurred.