M. J. TRUMBLE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

A. J. GUTZLER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

FRANCIS M. TOWNSEND, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

TRUMBLE REFINING CO. OF ARIZONA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 8007–8009, 11763, 17492, 26434, 28985, 32151.
Promulgated November 19, 1928.

*A. L. Weil, Esq.,* and *F. L. A. Graham, C. P. A.,* for the petitioners.
*C. H. Curl, Esq.,* and *I. R. Blaisdell, Esq.,* for the respondent.

OPINION.

Milliken: The issues raised in Docket Nos. 8007, 8008, 8009, and 28985 will be disposed of first. These petitioners complain of respondent's action in including in net income of the years in controversy as ordinary dividends subject to the tax, the entire amounts received in those years as distributions from the Trumble Refining Co. of Arizona. It is contended that a portion, if not all, of such distributions were in fact liquidating dividends or a return of capital not subject to tax. The allegations of the petitions are specifically denied by the respondent in his answers. No evidence was offered by the petitioners in support of those allegations. Under the circumstances, we may not disturb the action of the respondent of which petitioners complain.

In the case of M. J. Trumble, Docket No. 28985, it is further alleged that respondent erred in disallowing $600 of a total deduction of $1,200 claimed in the return for 1922, as expense of operating an automobile for business purposes. No evidence was offered by the petitioner in support of the material averments of his petition. We are unable, therefore, to find error in respondent's action.

In the appeals of the Trumble Refining Co. of Arizona, Docket Nos. 11763, 17492, 26434, and 32151, the sole question raised is the value of certain license contracts at March 1, 1913, for the purpose of computing the annual deduction for exhaustion. The petitioner claims a total value for these contracts at March 1, 1913, of $1,400,000. The respondent has computed the annual deductions for exhaustion upon the basis of a March 1, 1913, value for the contracts of $160,000. In an amended answer, respondent alleges error in the value previously determined by him, and asserts that they were without any

value at the basic date which might be made the subject of an allowance for exhaustion.

We are not certain of the position of the respondent in this proceeding. At the hearing, counsel filed an amended answer alleging error in allowing a March 1, 1913, value for the contracts of $160,000 and that the contracts had no value as of March 1, 1913, which was or is subject to exhaustion allowances under the Revenue Acts of 1918 and 1921. We will proceed upon the understanding that only a question of fact is involved, i. e., the March 1, 1913, value of the contracts in question. Counsel for respondent in brief filed does not contest the legal right to an exhaustion allowance if the contracts did in fact have an ascertainable value on March 1, 1913, or the long line of Board decisions wherein allowances have been claimed before and allowed by us.

Petitioner has offered proof of the value claimed for the contracts along three lines: First, evidence as to a certain transaction which occurred in February 1913, in which 1,000 shares of its common capital stock was exchanged between two individuals for a cash consideration; secondly, evidence of existing circumstances and conditions at March 1, 1913, as the basis of prognosticating the future earnings under these agreements; and, thirdly, the actual results obtained under these contracts to the beginning of the present year.

The stock transaction referred to is that in which Francis M. Townsend, president of petitioner company, sold to A. L. Weil, a director of petitioner and general counsel of the General Petroleum Co., in February 1913, 1,000 shares of petitioner's common capital stock for $500 cash. The petitioner relies upon this transaction as establishing a value of 50 cents per share for the entire 3,200,000 shares of common stock outstanding at March 1, 1913, and then reasons that " If the common stock had a value of 50 cents a share, the preferred shares were necessarily worth par [$800,000], and therefore the value of the outstanding stock at the time of the sale, which was just prior to March 1, 1913, was $2,400,000." From this sum, the petitioner deducts $1,000,000, the selling price of the patents in 1915, leaving $1,400,000 which it claims represents the March 1, 1913, value of the rights under the license contracts. The obstacles to accepting this line of reasoning or method of valuation are insurmountable, for the reasoning or method lacks the support of proven facts and takes too much for granted. The stock involved in this transaction was but one thirty-second of 1 per cent of the common stock, and only one-fortieth of 1 per cent of all the stock, outstanding at the basic date. To conclude that the selling price of this negligible quantity of stock fixes the fair market value of all the stock, both common and preferred, notwithstanding the utter lack of proof in that direction, requires the indulgence in assumptions as to diverse factors affecting

the marketability of 4,000,000 shares of stock and the rights of pre
ferred shareholders, which we are unwilling to make. The method
requires the further assumptions, wholly without proof of facts upon
which to premise them, that the March 1, 1913, value of the patents
was neither greater nor less than the selling price in 1915, and that
the petitioner, though apparently manufacturing all of the patented
apparatus for its licensees, had no assets of value other than the
patents and license contracts. Further, it is a matter of common
knowledge that the selling price or fair market value of the capital
stock of a corporation frequently bears no relation to, and is not a
reliable index of, the intrinsic value of the assets behind it; and, for
aught that we may know, this case offers no departure from such a
situation.

Other methods of valuing the rights under the license agreements
as of March 1, 1913, are suggested by the petitioner, but, like the
first, they depend too greatly upon the most optimistic speculation
and their bases lack the essential support of proven facts. One of
these is based upon the total number of barrels of oil which the
licensees, with the facilities in use or in course of construction at
March 1, 1913, would be able to treat between that date and the termi-
nation of their respective agreements, that is, 281,648,625 barrels.
The petitioner deducts from this number 25 per cent thereof to take
care of probable losses from casualties, strikes, fires, and the risks
of operation, and by prorating the remainder, 211,236,469 barrels,
among the 16 agreements and applying the applicable royalty rates,
it determines that the anticipated future earnings, at March 1, 1913,
were $3,208,222.03. This sum is then discounted to its present value,
at March 1, 1913, by the application of Hoskold's formula, the peti-
tioner finally arriving at a value of $2,175,078.29. This method is
offered to us with the suggestion that " It is well known that refinery
units are expensive to erect, and it cannot be presumed that parties
will actually build plants that are larger than they have an economic
use for." Nevertheless, the record shows that the plants of the 16
licensees were capable of treating a total of 281,648,625 barrels be-
tween March 1, 1913, and the termination of their agreements, but
that they actually treated up to January 1, 1928, only 9 months prior
to the expiration of the patents and termination of all agreements,
only 157,852,587 barrels, just 56 per cent of their possible capacity;
and, if we leave out of the reckoning the two plants of the General
Petroleum Co. at Los Angeles and Mojave, which were not com-
pleted until after the basic date, we find that as against a total rated
capacity for the 14 plants of the other licensees, of 117,398,625 bar-
rels, those plants, with but 9 months remaining for their agreements

to run, actually treated only 7,513,249 barrels, just approximately 7 per cent of possible production. It does not appear that this wide difference between possible production and actual production is entirely due to the result of conditions which arose after March 1, 1913, and which could not have been foreseen at that date. In the case of the Pacific Crude Oil Co., the possible production with the facilities at hand at March 1, 1913, to the termination of its license agreement, amounted to 28,297,000 barrels, but the record shows that not a single barrel of oil was treated by this company to the beginning of 1928, although it was obligated under its agreement to use the petitioners' patented apparatus for the treatment of oil to the exclusion of all other methods and processes. The American Union Oil Co. had facilities at March 1, 1913, capable of treating, from then to the termination of its agreement, 5,657,500 barrels of oil, but up to the beginning of 1928 it had actually treated only 9,632 barrels of oil, approximately one-sixth of 1 per cent of possible production, though it too was obligated to use the petitioner's patented apparatus for treating oil exclusively. Hardly less striking is the case of the Petroleum Development Co., with facilities at March 1, 1913, capable of treating, to the termination of its agreement, 50,640,875 barrels, though up to the beginning of the present year it has actually treated only 3,601,622 barrels, approximately 7 per cent of possible production. The Pacific Crude Oil Co., without production of a single barrel of oil during its agreement, could not have been treating, or have been in a position to treat oil with petitioner's patented apparatus at March 1, 1913; while the American Union Oil Co. and the Petroleum Development Co., with facilities of a rated capacity of approximately 1,200 barrels and 11,000 barrels per day, respectively, have had an approximate average daily production of but 3 and 770 barrels, respectively; and there is not a bit of evidence that the facilities of the last two mentioned companies were being used to any great extent at March 1, 1913, or that there was any prospect, at that date, of any greater use in the future.

Another method suggested by petitioner is based upon the quantity of oil being handled by the General Petroleum Co. at March 1, 1913, as the result of production from its own wells and oil acquired under purchase contracts, and the net oil reserves of the Chancellor-Canfield Midway Oil Co. with which the Petroleum Development Co. was merged, though the time of the merger does not appear in the record. At March 1, 1913, the General Petroleum Company was producing about 8,500 barrels of oil per day from its own wells and was handling an additional 7,000 barrels per day under purchase contracts. At the same date, the net oil reserves of the

Chancellor-Canfield Midway Oil Co. amounted to 55,519,171 barrels. Based on these facts, the petitioner suggests that an estimate at March 1, 1913, of the total amount of oil which the General Petroleum Co. and the Petroleum Development Co. would treat until the expiration of their agreements would have been 143,210,421 barrels. To this quantity the petitioner applies a royalty rate of 1½ cents per barrel, and thereby determines that the expected future royalties from these companies amounted to $2,148,156.31. This sum is then discounted to its present value, at March 1, 1913, by the application of Hoskold's formula, the petitioner finally arriving at a value of $1,456,385.53. There are several objections to the suggested method. There was placed in evidence a *resume* of the 12 contracts under which the General Petroleum Co. was purchasing oil at March 1, 1913. Of these 12 contracts, 6 expired during 1913, 3 expired during 1914, 1 expired in 1916, the term of another is not shown, and 1, the contract with the Ohio Valley Construction Co., does not expire until June 16, 1930. Whether there have been renewals of the contracts which have expired, or what the prospects for such renewals were at March 1, 1913, does not appear in the record. The contract with the Ohio Valley Construction Co. calls for the purchase of 500,000 barrels of oil and all production thereafter to the termination of the contract. There is no evidence as to the probable amount of oil which the General Petroleum Co. would acquire under this contract. The estimate of the total quantity of oil which would be treated by the General Petroleum Co. and the Petroleum Development Co. includes 55,519,171 barrels for the Petroleum Development Co., which represent the net oil reserves of the Chancellor-Canfield Midway Oil Co. at March 1, 1913. There is no evidence whether the merger of the Petroleum Development Co. with the Chancellor-Canfield Midway Oil Co. took place before or after March 1, 1913, or, if after, whether such a merger was contemplated at that date. Further, there is nothing to show that there was any probability, at March 1, 1913, that the entire oil reserves of the Chancellor-Canfield Midway Oil Co. would be extracted and treated prior to the expiration of the license agreement.

With the foregoing observations we reject the several methods of valuation suggested by the petitioner.

There is much, however, in the evidence which convinces us that the license contracts had a considerable value at March 1, 1913. Both the president of the General Petroleum Co. and the president of petitioner, who represented their respective companies in the negotiations, testified that the General Petroleum Co., then known

as the Esperanza Consolidated Oil Co., as an inducement to the petitioner to enter into the agreement of April 12, 1911, by which for a nominal cash consideration the Petroleum Company acquired a one-third interest in the petitioner, represented to the petitioner that it was entering upon the development of a large acreage of new oil land, that it was building a pipe line to deliver 30,000 barrels of oil per day at Los Angeles, that it proposed to use the patented apparatus of the petitioner exclusively for the treatment of this oil, and that license agreements for the use of such patented apparatus by its individual refining plants would be obtained as such plants were erected. The agreement itself supports the testimony of these two witnesses that the cash consideration stipulated therein was not the sole consideration, for it makes specific reference to representations made by the parties to each other; and the subsequent actions of the Petroleum Company, which are entirely in line with these representations, corroborates the testimony of these witnesses. There can be little doubt that out of these representations there arose obligations on the part of the General Petroleum Co. and rights to the petitioner which were just as binding and enforceable as though they had been specified in detail in the agreement, and not the least of these was the obligation of the Petroleum Company to use the apparatus covered by petitioner's patents exclusively in the treatment of crude oil.

At March 1, 1913, the General Petroleum Co. held in fee simple, by lease and by contract, 23,694.04 acres of oil lands in California, and 24,493.68 acres of such lands in the Republic of Mexico. All of these lands were being developed as rapidly as it was possible to do so. Already 160 producing wells had been brought in on the California lands, 6 more were being brought in, and 26 additional wells were being drilled, but all of this represented the development of only 900 acres of its lands. From these producing wells alone, the company was realizing an average daily production of 8,500 barrels of crude oil. In addition to this daily production, the company had approximately 202,000 barrels of oil in storage, and was handling under purchase contracts approximately 7,000 barrels of oil per day. An investigation of its lands by the Income Tax Unit led to the determination that the company's oil reserves at July 11, 1916, in lands which it held at March 1, 1913, was 32,986,058 barrels, but in arriving at this figure there were deducted royalty oils of 3,789,004 barrels. Between March 1, 1913, and July 11, 1916, there were extracted from these same lands 13,314,841 barrels of oil. Thus, at March 1, 1913, the General Petroleum Co. was in possession of oil reserves amounting to 49,999,903 barrels, which it was then bringing to the surface at the

rate of 8,500 barrels per day; but it had already adopted the policy of rapid development of its other lands, a policy which was being carried into effect at the date stated. As a matter of fact, the average daily production between March 1, 1913, and July 1, 1916, amounted to approximately 14,000 barrels. The company already had in operation five plants, the patented facilities of which were capable of treating to the termination of the agreements approximately 10,000,000 barrels of oil. The pipe line had been completed to Los Angeles, where, and at Mojave, refineries were under construction. Both of these refineries were located in accordance with petitioner's recommendations, were designed by the petitioner, and were being constructed under petitioner's supervision. The combined facilities of these two refineries when completed were capable of treating, during the life of the license agreements, approximately 164,000,000 barrels of oil, and there were actually treated in those plants up to the beginning of 1928, when the agreements had approximately nine months to run, 157,852,587 barrels of oil, which yielded to petitioner royalties of $2,161,907.92.

There is little of evidence as concerns existing conditions at March 1, 1913, in the case of the other licensees. As to them we know nothing more than the possible production of their facilities from March 1, 1913, to the termination of their agreements, the actual production up to the beginning of the present year, and the royalties paid to petitioner by those licensees.

The facts given to us are not readily adaptable to the application of any mathematical formula as a means of checking the reasonableness of our own judgment. Recognizing all the facts in existence or in contemplation on March 1, 1913, we have sought to determine what a willing buyer and willing seller, without any compulsion to act in the matter but purely in their own mercenary interests, would fix upon as a fair price for these agreements at the date stated. We have disregarded none of the evidence, but have given all of it due consideration, and have reached the conclusion that these license agreements had a fair market value at March 1, 1913, of $850,000. Since the average life of these agreements, at March 1, 1913, was 11 years, 8 months, 20 days, the petitioner is entitled to a deduction for exhaustion for each of the years in controversy, in the amount of $72,511.90.

*Judgment will be entered under Rule 50.*