**KEYSTONE STEEL & WIRE CO. v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 4514.**

Circuit Court of Appeals, Seventh Circuit.
Nov. 26, 1932.

Kix, Miller, Baar & Hoffman, of Chicago, Ill. (Arnold R. Baar and Arthur R. Foss, both of Chicago, Ill., of counsel), for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and John MacC. Hudson, both of Washington, D. C. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Dean P. Kimball, Sp. Atty. Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before ALSCHULER, PAGE, and ANDERSON, Circuit Judges.

ALSCHULER, Circuit Judge.

There is involved the fair market value, as of March 1, 1913, of an application for patent, filed July 12, 1907, for a machine for manufacturing woven wire fence which petitioner calls "Square Deal Fence," upon which application letters patent (No. 1,078,-702) were issued November 18, 1913. The Board of Tax Appeals fixed such market value at $200,000. Petitioner contends its value was upwards of $1,000,000.

Petitioner was a pioneer in the manufacture of woven wire fence. It was testified that as far back as 1890 it was making such fence, and that for some years was practically alone in that field. Others entered it, particularly the American Steel & Wire Company, which took the lead, soon producing 50 or 60 per cent. of the country's entire product of woven wire fence.

In 1897, one Bates was granted a patent for a machine for producing woven wire fence, which patent, a year or two later, was purchased by the American Company. Bates was also granted a patent on the product, but this was held invalid. The machine patent was sustained.

Petitioner's officers testified that the Bates machine, being more effective than petitioner's earlier machines, threatened seriously to interfere with petitioner's then well-established and quite extensive business, and thereupon petitioner set about to devise a new machine which would not infringe Bates.

Its Square Deal machine was devised, and petitioner began using it about the time application was made for the patent, and has ever since continued to use it. It was testified that the Square Deal machine effected a considerable saving in material over petitioner's prior machines, as well as over the Bates and other machines, and that gradually petitioner's prior machines were largely superseded by the Square Deal.

After petitioner's use of the Square Deal machine for about six years preceding the issue of the patent thereon, petitioner's production in 1913 was about 20,000 tons out of a total in that industry of 400,000 tons, as against the American Company's 50 or 60 per cent. of the total.

For petitioner it is contended that there is substantial evidence to support the value of $1,000,000. Petitioner's four witnesses testified that in their estimation the Square Deal invention had a fair market value of not less than $1,000,000. Their opinions were predicated on somewhat differing considerations.

Frederick estimated that on each of the 20,000 tons of fence which petitioner produced in the year ending June 30, 1913, there was a saving of $4.50—a total saving of $90,000. He said his estimate of market value was based on saving of material alone. Van Deventer estimated there was a saving in material of some $74,000 for that year. He considered also other factors in his estimate of market value, such as saving of time and labor, smaller investment in machines, because, being speedier, fewer were needed, lighter taxes, etc. These two men were officers of competing companies. Sommer and La Porte were officers of petitioner. Sommer placed most emphasis on saving in material, but admittedly considered other elements in estimating market value. He and La Porte did not conjecture as to saving in material, but used the amount ($56,656.51, Exhibit 7) shown by petitioner's books to have been an actual saving in material in the year ending June 30, 1913. La Porte considered speed and the saving of labor in addition to the saving of material. Frederick was asked to assume that there was actual saving in material of $56,656.51, and on that basis to make an estimate of market value, which he then placed at $700,000.

Frederick testified that the amortization of the amount paid for the patent had to be considered. He said: "To amortize the $1,-000,000 basis over seventeen years, if it was all to be wiped out it would have to be charged off at the rate of $55,000 to $60,000 a year." At the same time he testified that the value of the patent, based upon the ascertained saving it had effected, must be determined by what one desiring to make an investment would pay for a property or a right which yielded such an annual return.

An investor having a million dollars to invest might be willing to invest it, as was testified, upon an assured return of 8 per cent. per annum; but this could hardly be expected if at the end of seventeen years the return would altogether cease, and the investment itself disappear.

As was stated by Frederick, apart from the question of interest, the principal of a million dollar investment in this invention would largely, if not entirely, vanish at the rate of one-seventeenth of a million dollars per annum through limitation of the life of the patent. We do not think it likely that one with a million dollars to invest would have been willing, on March 1, 1913, to invest it in such property on the prospect of receiving back only such annual return for seventeen years.

One having a million dollars to invest could reasonably have expected an absolutely secured investment with annual interest return of 5 per cent., or $50,000, per annum, and at the end of any stipulated period to receive back his full principal. It is not conceivable that a prospective investor, with opportunity to obtain 5 per cent. annual return on a secured investment with capital unimpaired, would have been willing to accept for a period of seventeen years an annual return of 8 per cent. per annum with his invested capital dissipated at the end of the period.

As Frederick and others testified, the question of the market value must be considered from the standpoint of the investor having money to invest, and desiring to invest it to his best advantage. It must be considered that the average investor desires his investment to be secure, and not subject to risks so very often inherent in such precarious properties as patent rights.

Harking back to March 1, 1913, we find this application for patent still pending in the Patent Office. Although still subject to possible contingencies pending issue, it had reached that stage where we are willing to treat it substantially the same as if the patent had then been issued.

Utility of the invention had appeared from the six or more years of use of machines embodying its principle. The invention, being for a machine which was used by petitioner only, was not necessarily disclosed to the public before the patent actually issued, and there was then no public recognition of the invention or of petitioner's monopoly. But after issue the success of the invention would be subject to the contingencies ordinarily incident to patents, such as infringement, resistance, other inventions whereby a similar article could be produced, and the extent and character of competition. There was no patent on the product of the Square Deal machine. The Anthony machine, owned by the American Company, produced substantially the same article as the Square Deal, but at considerably slower rate.

It was pointed out for petitioner that the American Company, with its great capital, and its advantage of long success in the field, held a dominating position, from which it probably could not be dislodged even by the superior Square Deal machine. While this was intended to explain why the American Company's product retained its ascendency in the trade which it held March 1, 1913, it indicates also the then existence of a powerful competitor who might seriously interfere

with the hoped for success of a later and superior invention.

■ It is common knowledge that meritorious inventions are very often relegated to oblivion through the machinations of well-intrenched and powerful competitors. The very situation shown by the evidence to have been present on March 1, 1913, would tend materially to minimize the then market value of the Square Deal patent application. It is not conceivable that under those circumstances any prudent investor would then have been willing to risk so very large a sum on this invention.

It was then no doubt common knowledge in the industry that the Bates patent, under which the American Company had largely achieved its dominant position, would expire the very next year, and would be open to others who might care to enter the field, thus possibly raising up yet other competitors for the trade.

Six years of prior actual use of the superior Square Deal machine had made such comparatively small inroad on the dominance of the American Company that prospective investors would have been slow indeed to invest in this prospective patent, however meritorious, anywhere near what petitioner's witnesses testified its market value then was. Considered as a matter of prudent investment, the testified value, whether $1,000,000 or $700,000, would, in our judgment, be very far in excess of what any investor of ordinary prudence would then have invested in this invention, and therefore grossly greater than the then fair market value.

It is interesting to note (though not controlling, and perhaps of no great evidentiary significance) that Petitioner's Exhibit 5 indicates that, as of July 1, 1913, there was carried on petitioner's books, in the balance sheet, the item "Patents at Cost, $57,123.31," and that it nowhere appears that thereafter petitioner's books carried such an asset at any substantially higher figure.

There was no evidence to indicate what had then been realized on the sale of other patents, save only Frederick's testimony to the effect that it was generally talked in the industry that the Bates patent, under which Frederick said more fence was made than on any other machine in existence, was sold shortly after its issue for $80,000; but this was hearsay, and that purchase was made about fifteen years prior to 1913.

We are of the view that the opinion evidence of value as testified by petitioner's witnesses falls far short of having substantial support in the evidence.

■ The Board of Tax Appeals was not bound by the opinions of the witnesses upon value, but could exercise its own judgment thereon, predicated upon the evidence. Tracy v. Commissioner, 53 F.(2d) 575 (C. C. A. 6); Anchor Co. v. Commissioner, 42 F.(2d) 99 (C. C. A. 4); Am-Plus Storage Battery Co. v. Commissioner, 35 F.(2d) 167 (C. C. A. 7).

But petitioner insists there is entire absence of evidence to justify the Board's valuation of $200,000. If this insistence implies that no witness fixed this particular figure as the value of the invention, it is quite correct. But if, as we hold, there is no substantial evidence to support a valuation of $1,000,000 or $700,000, does it follow that the Board may not exercise its best judgment, under all the evidence, in fixing a value which it deems fair?

■ It is not essential that there be testimony of a specific figure to admit of the Board's exercising its judgment in this respect. The situation of petitioner on March 1, 1913, was fairly reflected by the facts in evidence. The question was: What would the reasonable investor, willing to buy at a fair price, have paid for this invention March 1, 1913?

■ Considering the utility of the invention, as shown by its use for the years preceding March 1, 1913, the risks inherent in such property, the disinclination of investors to take undue chances with their funds, the then sharp competition in this line of business, and the existence of powerful and well-intrenched competitors therein then controlling the large bulk of the country's entire production in that line, we are convinced that the Board fairly and reasonably fixed the value. Whether, had we been triers of the facts, we might have fixed it somewhat higher, or even lower, is beside the question. There is, in our judgment, substantial evidence to sustain the finding as made, and in such case we are not at liberty to disturb it. Phillips v. Commissioner, 283 U. S. 589, 600, 51 S. Ct. 608, 75 L. Ed. 1289; Hutchins Lumber & Storage Co. v. Commissioner, 53 F.(2d) 1016 (C. C. A. 7); Planters' Operating Co. v. Commissioner, 55 F.(2d) 583 (C. C. A. 8).

A case has been decided recently by the Sixth Circuit Court of Appeals under facts strikingly like those here, and the decision of the Board was sustained fixing the value of a patent at $200,000 where opinion evidence for the petitioner fixed it as high as $2,000,-

000, and, as here, no opinion evidence of value appeared on behalf of the Commissioner. Grand Rapids Store Equipment Corp. v. Commissioner, 59 F.(2d) 914.

The order of the Board of Tax Appeals is affirmed.

PAGE, Circuit Judge.

Dissent is made because of my belief that neither the majority members of this court nor the Board of Tax Appeals could have reached the conclusion without ignoring factual evidence.