## GRIFFITHS et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4972.

Circuit Court of Appeals, Seventh Circuit.
March 23, 1934.

Rehearing Denied June 19, 1934.

John G. Campbell, Herman A. Fischer, and Carlton L. Fischer, all of Chicago, Ill., for petitioners.

Sewall Key and John MacC. Hudson, Sp. Assts. to Atty. Gen. (E. Barrett Prettyman, Gen. Counsel, Bureau of Internal Revenue, and C. R. Marshall, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Paysoff Tinkoff, of Chicago, Ill., pro se.

Before EVANS, SPARKS, and FITZ HENRY, Circuit Judges.

EVANS, Circuit Judge.

Disposition of this appeal necessitates the consideration of three questions raised by petitioners. Two of the contentions are made by petitioner John Griffiths alone, while the third contention is made by both petitioners.

(a) John Griffiths complains because he was not allowed a deduction in the year 1925 for an alleged worthless debt which he charged off that year and which he deducted from his income. The Commissioner and the Board disallowed the item. The facts relevant thereto are:

Prior to June 8, 1921, Margaret, the daughter of John Griffiths, married Alfred Betancourt, a broker of Havana, Cuba, who conducted a brokerage business under the name of Betancourt & Company. In 1921, Mrs. Betancourt negotiated a loan of $100,-000 from her father to her husband to be used in constructing a cable line from Havana, Cuba, to New York City. To evidence the loan, a note, signed by said daughter, her husband, and Betancourt & Company, was given on June 8, 1921, for $100,000, payable on or before two years from date, with interest at the rate of six per cent. per annum. On the back of the note, the payee made the following endorsement: "Pay to order of Margaret G. Betancourt without recourse on me. (Signed) John Griffiths." This endorsement was made on the note so that his daughter might not be annoyed over its payment in case of John Griffiths' death prior to the payment of the note. The note was never paid and was kept in the possession of John Griffiths, who was at

the time advanced in years. No interest was ever paid on the note, and Betancourt & Company failed shortly after the money was loaned. Investigation was made and failed to reveal any assets in the hands of Alfred Betancourt or his company from which payments could be made. Margaret Betancourt was the beneficiary of a large trust fund, and she and her husband lived on the income of this trust, which was $15,000 annually.

The disallowance of this item may be sustained on any one of three grounds: (1) The evidence does not show that the loss, if it occurred at all, was for the taxable year 1925. (2) There is not a sufficient showing to justify a finding that the loan was a total loss. The note was executed by the daughter who had an independent income of $15,000 a year. If it be admitted that her husband and her husband's company were insolvent, it by no means follows that a note signed by one with an annual income of $15,000 was worthless (section 214 (a) (7), Revenue Act 1926, 26 USCA § 955 (a) (7)). (3) Likewise, the endorsement on the back of the note might fairly evidence an intent on the part of the taxpayer to make a gift of this indebtedness to his daughter.

■ (b) Petitioner John Griffiths also complains because of the disallowance of an expense incurred by him in 1924 in negotiating a ninety-nine year lease of property owned by him.

In 1924, John Griffiths paid $31,108.54 in commissions and fees to real estate brokers and attorneys in connection with a lease executed by him for a term of ninety-nine years. The Commissioner and the Board of Tax Appeals held that the amount so paid was a capital expenditure and could not be deducted in full in 1924 as a business expense, but should be allocated over the entire ninety-nine year period. Petitioner conceded on oral argument that the entire amount should not be deducted in the year 1924, in view of the decision in Central Bank Block Ass'n v. Commissioner (C. C. A.) 57 F.(2d) 5. He argues, however, that it is unfair to a taxpayer to permit of a deduction of only one ninety-ninth of such cost for the first year.

There is unquestionably much of merit in the position of the taxpayer—that such a cost should not be spread equally over the entire ninety-nine years, but in view of the numerous decisions [Home Trust Co. v. Commissioner, 65 F.(2d) 532 (C. C. A. 8); Meyran v. Commissioner, 63 F.(2d) 986 (C. C. A. 3); Tonningsen v. Commissioner, 61 F.(2d) 199 (C. C. A. 9); Central Bank Block Ass'n v. Commissioner (C. C. A.) 57 F.(2d) 5], we believe it is a matter for legislative relief rather than for a court to arbitrarily determine how the expense of negotiating a long time lease should be distributed.

(c) The rejection of taxpayers' third contention involves a large sum and affects both petitioners. Briefly stated, the facts are:

John Griffiths was the founder of a contracting business in Chicago which developed into a large and successful venture. He was, for over fifty-five years, engaged in the building and contracting business, and his record of accomplishments in this industry is most impressive. His son, George W. Griffiths, was associated with him for twenty-eight years. He formed a partnership with his son in 1904. Later, in 1911, a corporation was formed which succeeded the partnership. The partnership was operated under the name of John Griffiths and Son, and the corporation was known as John Griffiths and Son Company.

The authorized capital of this corporation was $100,000, represented by 1000 shares of stock. The partnership assets were purchased for $35,000 par value stock. 322 shares of the stock of this corporation were issued to John Griffiths, and 28 shares to George W. Griffiths. Later 600 shares of the stock were purchased by John Griffiths, and 50 shares by George W. Griffiths. Subsequently, John Griffiths assigned certain of his stock to George W. Griffiths so that the latter owned 186 shares of the stock. In November, 1922, the corporation declared a stock dividend of $900 per share, thus increasing the capital stock to $1,000,000. Of this stock, John Griffiths held 8,140 shares and George W. Griffiths, 1,860 shares. On September 5, 1923, there was organized in Delaware a new corporation under the name of John Griffiths and Son Company, with a capital stock of $2,000,000, consisting of 10,000 shares of seven per cent. preferred stock, par value $100, and 40,000 shares common stock, par value $25. The new corporation acquired all of the stock of the old corporation, and issued in exchange therefor its own stock to the amount of $1,000,000 par value preferred stock and $750,000 par value common stock, and in addition thereto, paid $500,000 in cash. The old corporation was thereupon liquidated, and its business and assets were taken over by the new Delaware corporation. When the old company went out of business, it showed an investment amounting to $2,250,000, which was made up of three items: $1,000,000 capital stock, $1,114,681.01 surplus, and $135,318.99 good will. The new company was

charged with a like asset account of $2,250,-000, which was composed of three items: cash, $500,000; preferred stock, $1,000,000; and common stock, $750,000.

In December, 1925, the preferred stock was retired through a cash distribution of $1,200,600, which amount covered the par value, premium, and dividend on said preferred stock.

Of the amount thus distributed upon the retirement of the preferred stock, John Griffiths received $977,288.40 and George W. Griffiths received $223,311.60. In their 1925 income tax returns, George W. Griffiths reported $165,162.51 and John Griffiths, $722,-807.97, as capital net gains from the distribution of the moneys received for the preferred stock. The amounts thus reported by the taxpayers represented what they asserted to be the difference between the amounts received and the asserted March 1, 1913 value of the old corporation's stock.

The difference between the parties arises out of the values placed upon the stock of the old John Griffiths and Son Company as of March 1, 1913, and the values of the common and preferred stock of the Delaware corporation at the time of the exchange in 1923.

The Board of Tax Appeals found the value of the latter corporation stock at the time of the exchange was $2,000,000, of which $1,000,000 was common and the balance represented by the preferred stock. It found the value of the old corporation stock on March 1, 1913, was $1,000,000.

Petitioners contend that the value of the old corporation stock as of March 1, 1913, was not less than $2,000,000 and the 1923 value of the new corporation stock was $1,500,000, of which the common was worth $500,000 and the preferred, $1,000,000.

The chief basis of petitioners' attack on the finding of the March 1, 1913, value of the stock is traceable to the Board's alleged failure to give due effect to the earnings of the copartnership and the corporation for a period of several years prior to this date. Petitioners assert that the average earnings for a period of five years were approximately $287,-000. On the basis of these earnings they confidently assert that the value of the stock of the old corporation was at least twice as high as the Board found.

This argument would be more persuasive if the alleged earnings were established with more certainty. The importance of earnings over a considerable period of time is admitted. It is not, however, conclusive. In the instant case, moreover, there is serious question as to the propriety of including one item of $475,578.78 in the company's earnings.

The Board, in passing upon this question said:

" * * * From the maze of exhibits offered, including ledgers, journals, contract records, * * * it is difficult to reach any conclusion other than that a very confused state of affairs existed and that certainly to some extent the partnership or the petitioners apart from the corporation were directly concerned in the activities carried on after the formation of the corporation. * * * Suffice it to say that with a condition thus existing we see little that is helpful in the earnings presented as a basis for valuing even the assets of the corporation, much less the stock, which is our immediate concern. * * *

"We have considered the question of earnings as indicative of value at some length not only because of the earnestness with which it has been urged upon us by the petitioners as a method of valuing the stock in question, but also because the average earnings and average net tangible assets form the basis of the so-called expert testimony produced."

It seems to us that if the rule which requires us to accept the findings of the Board, if there be substantial evidence to support them [Keystone Steel & Wire Company v. Commissioner (C. C. A.) 62 F.(2d) 458], is to be given any force, it must be applied to cases like the one now before us. When this rule is applied to a complicated fact situation and the ultimate finding which is in dispute is based upon numerous items of evidence over all of which there is a sharp dispute, the significance and the efficacy of the rule are better appreciated and more fully acknowledged. In such a case the reviewing court is hardly justified in disturbing a finding because one of the several factors which made up the finding is out of harmony with it.

To illustrate: The finding as to the value of stock of a corporation is assailed because the average earnings of the corporation show a better than twenty per cent. return on the stock. This would suggest a market value well above par. The book value of the assets of the corporation, however, is but forty per cent. of the par value of the stock. The effect of evidence of large earnings is at least partially offset by the low asset value of the corporation.

Such is the situation in the case we are considering. The value of the assets of the corporation in 1923 was not far from the val-

uation which the Board placed upon the stock. In addition thereto, the company's profitable business was established for a longer period of time. Reviewing the valuation of the stock in 1913, we find the physical assets were far below the value which the Board placed upon the stock.

In accepting the findings of the Board, we recognize that there must, at best, be some arbitrariness displayed by the fact-finding body which attempts to place a market value upon the stock of a corporation which is closely held, none of which has ever been sold or offered for sale and the value of which depends to a large extent upon the splendid reputation and integrity of two individuals, who are the owners of all the stock and who are in direct charge of the affairs of the corporation. And the uncertainty which necessarily attends such an effort increases when the said trier of fact attempts to place a value upon such stock after the lapse of twenty years.

As to the allocation of the profits between the common and preferred stock of the Delaware Company, we are entirely satisfied with the action of the Board.

The decisions are affirmed.