**B. F. STURTEVANT CO. et al. v.
UNITED STATES.**
No. 6237.

District Court, D. Massachusetts.
Jan. 20, 1937.

30

Philip Nichols and Brayton M. Morton, both of Boston, Mass., for plaintiffs.

Francis J. W. Ford, U. S. Atty., and Arthur L. Murray, Sp. Asst. to U. S. Atty., both of Boston, Mass.; for defendant.

BREWSTER, District Judge.

This petition is brought to recover income and profits taxes for the year ending June 30, 1920, which, petitioner alleges, were unlawfully exacted. Claim for refund was seasonably filed. Two issues are presented:

1. Whether the petitioner, the B. F. Sturtevant Company (hereinafter called the petitioner), and the Sturtevant Aeroplane Company (a subsidiary corporation) were entitled to be taxed on the basis of their consolidated invested capital and consolidated net income for the year ending June 30, 1920.

2. What value of patents and patent rights, as of March 1, 1913, should be used as a basis for an allowance for exhaustion of such patents for the same year.

The statute involved in the consideration of the first issue is section 240 of the Revenue Act of 1918 (40 Stat. 1081), which, so far as material, reads:

"Sec. 240. (a) That corporations which are affiliated within the meaning of this section shall, under regulations to be prescribed by the Commissioner with the approval of the Secretary, make a consolidated return of net income and invested capital for the purposes of this title and Title III, and the taxes thereunder shall be computed and determined upon the basis of such return: Provided, That there shall be taken out of such consolidated net income and invested capital, the net income and invested capital of any such affiliated corporation organized after August 1, 1914, and not successor to a then existing business, 50 per centum or more of whose gross income consists of gains, profits, commissions, or other income, derived from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive. In such

case the corporation so taken out shall be separately assessed on the basis of its own invested capital and net income and the remainder of such affiliated group shall be assessed on the basis of the remaining consolidated invested capital and net income. * * *

"(b) For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others."

It was in evidence, I think properly, that for a period of thirteen years the Bureau of Internal Revenue had, for the purposes of taxation, treated the two corporations as affiliated, within the meaning of the statute. In litigation involving taxes for other years, the Board of Tax Appeals had adjudged the corporations as affiliated. If the establishment of consolidation in 1920 was not technically res adjudicata, the decision of the Board is at least prima facie evidence of the propriety of consolidation. Tait, Coll. v. Western Maryland Railway Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405; Nachod & United States Signal Co. v. Helvering, Com'r (C.C.A.) 74 F.(2d) 164; Appeal of Union Metal Mfg. Co., 4 B.T.A. 287.

Apart, however, from the question of estoppel or res adjudicata, it is clear that the facts of the case afford no justification whatever for the sudden reversal of the policy of the Department which did not result from the discovery of any new facts by the Commissioner.

The petitioner owned all of the stock, except qualifying shares, of the Sturtevant Aeroplane Company, which was organized August 1, 1914, and 50 per cent. or more of its gross income was derived from government contracts made between April 6, 1917, and November 11, 1918. The only question is whether the Aeroplane Company was a successor to a business existing on August 1, 1914. I find, on the evidence adduced at the hearing, that it was.

In 1909 there was created in the plant of the petitioner a branch, or subdivision, operating under the name of "Sturtevant Manufacturing Company," which was engaged in designing and constructing aeroplane motors, or plane equipment. That Department built and sold a few completed aeroplanes. The business was conducted at the factory of the petitioner with funds

furnished by it. The activities of the Aeroplane Company were under the supervision of Noble N. Foss, a son of the president of the petitioner, and one Harold Bliss.

In 1915 the business of the airplane department was taken over by the Sturtevant Aeroplane Company, a Massachusetts corporation, which continued to manufacture and install airplane motors.

It is the contention of the government that on these facts the affiliated corporation was not a successor to a then existing business within the purview of the statute, its argument being that since the B. F. Sturtevant Company, of which the Sturtevant Manufacturing Company was merely a branch or department, continued to function after the organization of the Aeroplane Company, there was no succession to a then existing business.

I am unable to regard this contention as sound. When the petitioner saw fit to carry on in corporate form one of the activities which it had theretofore conducted, and organized for that purpose a subsidiary corporation to take over the manufacturing of airplane motors, the corporation succeeded to the business of the petitioner, which it had heretofore carried on under the name of "Sturtevant Manufacturing Company."

It is difficult to conceive circumstances which would more clearly establish a succession of business than the facts of this case. The suggestion that when one of the activities of a parent corporation has been taken over by a subsidiary the parent corporation must go out of existence, is a suggestion which I cannot accept as valid.

I find and rule, therefore, that the sudden decision of the Commissioner in refusing to treat the two corporations as affiliates, for the purpose of taxation, was wholly without warrant in fact or in law.

Respecting the value of petitioner's patents, it appears that the same issue had previously been the subject of litigation. The Board of Tax Appeals had held that the petitioner had failed to establish a definite value for the patents in excess of $100,000, which had been allowed by the Commissioner. Upon appeal, the Circuit Court of Appeals for this Circuit [B. F. Sturtevant Co. v. Com'r of Internal Revenue, 75 F.(2d) 316, 323] reversed the decision of the Board of Tax Appeals, saying in part:

"From the evidence offered as to the earnings from the four principal patented articles during the five years prior to March 1, 1913, and the prospect of future sales on that date, and the opinion of witnesses familiar with the value of patents, we think only one reasonable conclusion could be arrived at, namely, that the taxpayer's patents had a value on March 1, 1913, far in excess of $100,000."

By stipulation, the proceedings in the Board of Tax Appeals were suspended awaiting final judgment in the case at bar.

The Circuit Court of Appeals reviewed, somewhat in detail, the evidence before the Board of Tax Appeals. In some respects, the petitioner here has presented an even stronger case. In view of the foregoing, I feel bound, out of deference to the opinion of the Appellate Court, to find a value substantially in excess of $100,000.

The government presented evidence which was not before the Board of Tax Appeals, which I will consider later.

The patents and patent rights involved were acquired between 1908 and 1912. The business of the B. F. Sturtevant Company was started about 1861 by one Benjamin F. Sturtevant, an inventor and a man of exceptional mechanical ability. He died in 1890, and after his death the B. F. Sturtevant Company was formed. The company took over Mr. Sturtevant's patents, most of which had expired by 1903. During the period 1890 to 1902, when the Sturtevant patents were in force, the company operated at a substantial profit. Between 1902 and 1908, before the patents in issue had been acquired, the company operated at an annual loss. In 1908 there was a definite change of policy in regard to patents, and the company began to acquire the patents involved in this controversy; and during the period 1909 to 1913 the average annual earnings were over $250,000.

It is abundantly established by the evidence that these increased earnings of the company can be attributed in large part to the monopoly secured by the patents and exclusive rights which the petitioner had acquired. These patents readily fall into four groups, as follows:

1. Those relating to Multivane Fans.
2. Those relating to Fuel Economizers.
3. Those relating to Slow Speed Fans.
4. Those relating to Turbines.

1. Multivane Fans. In 1908, the petitioner acquired rights in U. S. patent No. 860,465, issued to one Hancock, and in 1910 acquired the patent. Prior to the introduction of Multivane Fans, the paddle-wheel type was in use. Up to 1908 the petitioner manufactured this type. The new fan had distinct advantages over the earlier types and were extensively used in the United States Navy and by ship-builders for use in ventilating large vessels. For the five and one-half years prior to 1913, petitioner's sales of Multivane Fans increased from $14,000 to $365,000 a year, and thereafter, during the remainder of the life of the patent, the average sales exceeded $500,000 per year. This patent was involved in litigation which terminated finally in favor of the Sturtevant Company. There was no evidence that the litigation prevented, or suspended, manufacturing of the fan, or interfered with the enjoyment of the monopoly secured by the patent. The petitioner was required to spend, in connection with this litigation, over $66,000. The original cost was $7,800. The patent placed the petitioner in the lead in the fan business and contributed materially to the earnings of the company. Witnesses, called by the petitioner, who in my opinion were qualified to give an opinion based on relevant factors, put the value from $500,000 to $700,000 as of March 1, 1913. There was other evidence of value, which will be considered later in connection with all of the patents involved.

2. Fuel Economizers. Petitioner, on March 1, 1913, owned seven patents covering a device for conserving heat from gases escaping from consumed fuel. These patents were acquired between 1903 and 1911 and had an average remaining life of nine years and ten months. These patents embodied three improvements in the fuel economizer art: (1) The pipes were arranged in staggered rows which increased the efficiency of the economizer; (2) a type of tapered metal-to-metal joint, preventing leaking; and (3) a new type of soot scrapers to remove the soot accumulating on the pipes. This accumulation reduced the effectiveness of the device.

It was claimed that in 1913 the petitioner was doing more business in fuel economizers than all the other competitors combined, and that it was not until after the patents expired that the business in economizers using these improvements fell off, due to other conditions.

The only opinion evidence of value was that of the president who gave a value of $178,000, which was somewhat in excess of the valuation which he had placed upon this group of patents in earlier hearings before the Board of Tax Appeals.

3. Slow Speed Fans. This group consists of three patents issued in 1906 and 1907, with an average remaining life of nearly eleven years. These patents covered improvements in slow speed fans used for conveying away material and dust from wood-working establishments. The petitioner, since 1911, enjoyed an exclusive license to use the invention covered in the three patents without the payment of royalty. The license, however, was terminable by either party on notice, but during the life of the patent it was never terminated.

Fans embodying these inventions were shown, by testimony of witnesses, to have possessed advantages over other fans. A witness engaged in the business of designing, manufacturing, and installing dust-collecting equipment (and mechanical systems for the conveyance of light materials) testified that his company preferred the Sturtevant slow speed fan, even though it cost slightly more than other makes.

Petitioner had sold $170,000 worth of fans up to March 1, 1913, with a profit of over 50 per cent. and in the life of the patent a business of almost $1,000,000, with a like profit.

With reference to the foregoing patents and patent rights, the petitioner adduced further evidence as to value by segregating the profits arising from the manufacture and sale of each patented device for a period of five and one-half years preceding January 1, 1913. This was done by a somewhat elaborate process, which need not be repeated here, but which apparently reflected the true situation with a reasonable degree of accuracy. Then, by the application of Hoskold's well-known formula, these profits were capitalized and the value of the patents for the remaining life, based upon the earnings for the previous years, was determined.

According to the formula, the Multivane Fans had a value of $572,540; the fuel economizer patent a value of $96,538, and the slow speed fan a value of $77,682.

Petitioner's accountant, who worked out these results, adopted a second method of getting the value of the patent by de-

33

ducting from the annual profits of the business 8 per cent. of the value of the tangible assets and the excess treated as income from patents. This method gave a valuation of the Multivane Fan as $548,751; fuel economizer $88,610; slow speed fan $75,058.

4. Turbines. On March 1, 1913, the petitioner owned five patents for turbine engines, suitable to be used for operating fans, blowers, and similar apparatus manufactured by it. These patents were issued between 1909 and 1912 and had an average remaining life of fourteen years and five months.

These patents covered inventions of one Bentley, who was employed by the petitioner in 1910 and became engineer and manager of its turbine department in February, 1911. In July, 1911, four of these patents were assigned to the company. It was stipulated that the amount paid for acquiring and developing the Bentley turbine, up to March 1, was $25,000. Prior to 1907, the petitioner had made several types of small reciprocal steam engines, to be sold with fans and other apparatus which it manufactured. When the development of the turbine interfered with the successful sale of these reciprocating engines, the respondent set about to design a turbine but was not successful until it had contacted Mr. Bentley and, for the next few years, the company was engaged in experimenting with and perfecting a turbine in which the Bentley improvements were incorporated. By March 1, 1913, the company had succeeded in producing a turbine which immediately proved to be a commercial success. It was much in demand by the Navy Department and by ship-builders. The sales by the end of the year 1912 had reached $180,000; had exceeded $2,000.000 a year during the war; and had ranged between $200.000 and $400,000 thereafter. One of these patents, covering a nozzle, was in litigation which terminated unfavorably to the petitioner. The petitioner then discarded for a time the particular device covered by this patent, but found that it did not seriously impair the efficiency of the turbine.

Witnesses put a value of from $325,000 to $500,000 upon the group of Bentley patents. Owing to the fact that the turbine was in the experimental stage during the five years prior to March 1, 1913, it was impossible to obtain any figures as to capitalized earnings during that period to which to apply the Hoskold formula.

The respondent argues that the evidence of the petitioner upon the valuation cannot be accepted because the success of the petitioner in its business of manufacturing and selling the patented devices was due to its good will and excellent reputation in the trade. It was quite evident, both from the petitioner's and respondent's witnesses that the United States Navy displayed a preference for Sturtevant blowers and turbines; and that the standing and reputation of the company was an influencing factor. It may very well be that some allowance should be made on account of these demonstrated facts. I do not suppose, however, that they operate to reduce the value of the patents to a nominal sum. It may readily be conceded that the patents would have had only a nominal value if owned or controlled by one who had neither the ability nor the means to successfully exploit the invention. If the ability, resources and good will of the petitioner served to give the inventions a substantial value, which otherwise they would not have had, these are factors which the petitioner is entitled to have taken into account in determining a fair value of the patents.

The problem before this court is to ascertain the value to the petitioner of the patents, and not the value if owned by some one else not equipped to make a profitable use of them.

The evidence presented by the respondent was so wholly incompatible with the views expressed by the Circuit Court of Appeals, and was based upon such untenable ground, that it affords little assistance in the task of arriving at a fair and just conclusion respecting the value of these patent rights.

At the outset it may be well to dispose of contentions of the government, made with respect to the rulings at the trial. The respondent offered evidence of prior patents for the purpose of proving that some, or all, of the patents were invalid by reason of anticipation, or otherwise. I refused to receive this evidence for the purpose of showing invalidity. I quote, with approval, from the petitioner's brief:

"It would be a strange pervasion of law and justice if, after the United States Patent Office had issued a patent, and the patentee had enjoyed the use of it for its full term without infringement or controversy, and had sought to claim its law-

ful deduction for the depreciation, exhaustion or amortization of the patent, either from its cost or from its March 1, 1913, value, the United States could be heard to say that no matter how profitable the ownership of the patent had actually been, it could be given no value for depreciation purposes, because for some reason now brought up for the first time, the patent was invalid. Such is not the law." Champlin v. Com'r of Internal Revenue (C.C.A.) 78 F.(2d) 905; Providence Rubber Co. v. Goodyear, 9 Wall. 788, 19 L.Ed. 566; Eureka, etc., Co. v. Bailey, etc., Co., 11 Wall. 488, 20 L.Ed. 209; Adams v. Com'r, 23 B.T.A. 71, 103.

Whether the patented inventions were anticipated, or whether they could have been successfully assailed, is wholly immaterial. The important fact is that, with a single minor exception, none of them was successfully challenged, and throughout the life of the patents the respondent enjoyed the full benefit of the monopolies secured thereby.

■ I did receive in evidence a great number of patents, offered by the government, for the limited purpose of showing the state of the art in 1913. The record is barren of any evidence tending to show what impression these earlier patents made upon the art, or whether they met with any commercial success. Assuming that these patents were properly admitted, they can be given no weight in this case in the absence of evidence showing that they had an effect upon the business which the petitioner was able to carry on by virtue of its patents.

Attorneys for the respondent in their brief have made scant reference to this mass of testimony, from which I gather that they now regard it as immaterial.

■ Respondent has made a point that in a certain capital stock tax return of the petitioner, at or about the taxable period in question, the balance sheet set forth in one of the schedules ascribed no value to patents. It has been held that this omission will not operate as an estoppel or as an admission that the patents had no value in a suit involving a valuation for depreciation purposes. Nachod & United States Signal Co. v. Helvering, Com'r, supra.

■ Respondent argues further that inasmuch as two of the patents were involved in litigation, and the validity of none of

them had been adjudicated by the court, they should be given only nominal value. This contention is unsound in my opinion. If the evidence showed that there had been any interruption in the business of manufacturing and selling the patented device, by injunction or otherwise, as a result of the litigation, undoubtedly the pendency of infringement suits would have operated to reduce, to some degree, the value of the patents involved in the litigation. The evidence, however, was to the contrary. The mere existence of infringement suits was not enough to destroy the valuation. Syracuse Food Products Corp. v. Com'r, 21 B.T.A. 865, 885; Hewes v. Heiner (D. C.) 24 F.(2d) 748. See Appeal of Consolidated Window Glass Co., 1 B.T.A. 365; also Champlin v. Commissioner, supra.

■ A further objection urged by the government is that evidence was received as to the value of applications for patents which had been filed before March 1, 1913, upon which patents were subsequently issued; and also evidence of value of exclusive licenses. It is apparently well settled that depreciation may be allowed starting with the date of the issuance of a patent and extending over its whole life; but this rule does not preclude the taxpayer from including the value of these applications in the valuation of its patent. Hyatt Roller Bearing Co. v. United States (Ct. Cl.) 43 F.(2d) 1008; Com'r of Internal Revenue v. Stephens-Adamson Mfg. Co. (C.C.A.) 51 F.(2d) 681; Keystone Steel & Wire Co. v. Com'r (C.C.A.) 62 F.(2d) 458; Individual Towel & Cabinet Service Co. v. Com'r, 5 B.T.A. 158; Union Paper Co. v. Com'r, 9 B.T.A. 1010; Ball & Roller Bearing Co. v. Com'r, 15 B.T.A. 862.

That the value of licenses may be included is equally well settled; at least, in the Board of Tax Appeals. Appeal of The Service Recorder Co., 2 B.T.A. 96; Grelck Condensed Buttermilk Co. v. Com'r, 7 B.T.A. 79; Owens Bottle Co. v. Com'r, 8 B.T.A. 1197; Trumble v. Com'r, 14 B.T. A. 348; Independent Aetna Sprinkler Co. v. Com'r, 15 B.T.A. 521.

I am inclined to agree with the petitioner that the fact that these licenses were revocable would have little effect upon the present determination of value in the absence of any evidence that they were, in fact, revoked. The benefits of the patent were enjoyed by the petitioner throughout

their life and contributed, with other patents, in perfecting a commercially successful slow speed fan.

To the more technical objection that the applications and licenses were not specifically recited in the claim for refund, complete answer would seem to be that the courts have always considered that the word "patent" includes exclusive rights secured by an application or by license. Gayler v. Wilder, 10 How. 477, 13 L.Ed. 504; New Haven Sand Blast Co. v. Dreisbach, 102 Conn. 169, 128 A. 320.

I am convinced that my rulings respecting the admissibility of evidence relating to the value of applications for licenses were correct. It must be borne in mind that we are dealing with the value of intangible property, liable to depreciation. Congress has granted to taxpayers a right to deduct from such intangibles a certain amount for depreciation, and there is no justification for the application of strict rules of construction in dealing with the pleadings in the case.

It is to be regretted that the government did not assist the court with some credible evidence upon the value of patent rights from witnesses who were able and willing to give opinion evidence, based upon factors which the courts have repeatedly said a taxpayer was entitled to have considered. No help can be derived from the testimony of witnesses who refused to ascribe to the patents more than a nominal or nuisance value, who were unwilling to take into account the profits which have accrued to the petitioner resulting from the use of the patented invention, and who failed to give any opinion as to the value of these patents as a group covering improvements which, taken separately, might have little value. but which, when brought into co-operation, enabled petitioner to produce complete fuel economizers, slow speed fans, or turbines which admittedly excelled other devices in the market.

One witness for the government justified his opinion that one of the patents had only a "nuisance value" because its validity had never been adjudicated. From what already appears above, this evidence can be given very little weight.

Obviously, it is not easy to fix the value upon patents and patent rights. All that can be hoped is that the court arrives at some fair and equitable conclusion, based upon the evidence before it.

I think that, in all probability, the valuation placed upon the patents by officers of the company may be somewhat excessive. On the other hand, the valuations which have been ascertained according to the Hoskold formula may not, in all cases, be sufficiently favorable to the company.

According to the petitioner's evidence, the lowest valuation put on all the patents and patent rights exceeded $1,200,000. I am constrained to make some deduction from this sum to cover elements of value that may not be directly attributable to the patents and have reached the conclusion that a valuation of $750,000 would be fair to all parties.

Petitioner's attorney may submit a computation of the tax, computed consistent with this opinion, and if the respondent does not agree to the amount, the case may be set down for further hearing for the purpose of ascertaining the sum for which judgment should be entered for petitioner.