**Carl E. and Paula KOCH, Plaintiffs-Appellees and Cross-Appellants,**

**v.**

**UNITED STATES of America, Defendant-Appellant and Cross-Appellee.**

**Nos. 18575, 18576.**

United States Court of Appeals, Seventh Circuit.

March 13, 1972.

Howard G. Krane, William D. Maddux, George B. Javaras, Chicago, Ill., for Carl E. and Paula Koch.

Fred B. Ugast, Acting Asst. Atty. Gen., Elmer J. Kelsey, Meyer Rothwacks, Richard W. Perkins, Attys., Tax Div., Dept. of Justice, Washington, D. C., James R. Thompson, U. S. Atty., Chicago, Ill., for the United States.

Before CUMMINGS, PELL, and SPRECHER, Circuit Judges.

CUMMINGS, Circuit Judge.

These appeals were generated by a suit for refund of federal income taxes assessed and collected for the years 1958 through 1963. After a jury trial, judgment was entered for taxpayer [1] in the sum of $68,194.39, plus statutory interest, with each party to pay its own costs. The taxpayer was considered entitled to capital gains treatment on the gain from the sale of Florida land during 1958 and the years 1960 through 1963 because the jury found that the property sold during those years was not held primarily for sale to customers in the ordinary course of business. On the other hand, as to 1959, the jury's verdict was in favor of the Government on the ground that the property sold in 1959 was held primarily for sale to customers during the ordinary course of business. The Government appealed with respect to all years except 1959, and taxpayer has cross-appealed with respect to that year.

---

1. Carl E. Koch will be referred to as the taxpayer, for Paula Koch is a party merely through having signed a joint income tax return for the years in question.

In 1947, taxpayer, a resident of Evanston, Illinois, retired and purchased a winter home in Clearwater, Pinellas County, Florida, but his permanent residence continued to be in Evanston. From 1947 to 1952, he purchased 2,300 acres of land in two large tracts from private parties and 5,700 lots principally from the State of Florida at tax sales, all in Pinellas County. He hoped for a dramatic increase in their value because an anticipated population increase would cause a substantial demand for the land he had purchased in a depressed market in a limited peninsular area.

Taxpayer testified that these properties were purchased for investment rather than for a land-sale operation. He did not notice the land for sale nor place nor authorize the placing of signs thereon, nor otherwise promote its sale. He did not give brokers listings for its sale. He only held a broker's license during part of 1951 and 1952. He made no improvement on the land and voted against special assessments for improvements. If he made any effort to sell his property, he could have sold it all in three to five years. The amount of land he sold as a reluctant seller averaged less than 1% of his holdings per year, and he received a price two or three times above what other owners obtained. During the critical 1958–1963 period, taxpayer was not even

usually in Florida except during part of the winters of 1958 and 1959. The unsolicited offers to purchase his land were therefore forwarded to him in Illinois after the interested purchasers ascertained ownership from Pinellas County land records.

Taxpayer accepted offers where the price would reflect appreciation at least equal to what he considered the investment value. Although his average purchase price of lots sold during the taxable years was approximately $90, the average selling price was approximately $1650. During the same six-year period, 20% of the lots and 5 parcels of acreage, accounting for approximately one-third of his gain during the period, resulted from sales made under threat of condemnation.

In 1962, after a jury trial, taxpayer won a similar tax refund suit with respect to Pinellas County land sold in 1951 and 1952. Thereafter, the Government asserted deficiencies against taxpayer for 1958 through 1963, on the same ground as in the 1962 suit, namely, that his gain was taxable as ordinary income because he held the property for sale to customers in the ordinary course of business.

The following table reveals the basic facts of the 1958–1963 land sales:

| Year | No. of Lots Sold | No. of Transactions | No. of Parcels Sold | Average Holding Period | Gains as %age of Taxpayer's Tot. Income | Profit |
|------|------|------|------|------|------|------|
| 1958 | 39 | 25 | 2 | 8.4 Yrs. | 20.9% | $ 52,681.09 |
| 1959 | 103 | 31 | 1 | 10.5 | 25.9 | 88,834.62 |
| 1960 | 58 | 25 | 0 | 10.7 | 12.8 | 6,996.17 |
| 1961 | 21 | 15 | 0 | 12.1 | 10.4 | 22,859.02 |
| 1962 | 7 | 5 | 3 | 12.9 | 37.7 | 114,645.90 |
| 1963 | 10 | 6 | 1 | 14.6 | 6.9 | 25,131.33 |

■ The Government introduced evidence of the taxpayer's sales of real estate in Pinellas County during 1953 through 1957, showing, for example, that in 1953, 142 lots and one parcel had been sold in 32 transactions, and in 1957, 60 lots and 3 parcels had been sold in 31 transactions. Testimony presented

by the Government also showed that a seller's market existed with respect to Pinellas County land in 1958 through 1961, making extensive advertising unnecessary. One of the Government's witnesses was Thomas Black, who had managed taxpayer's Florida real estate operations from 1947 through 1951. Black, who

left Florida in 1952, had been the Government's principal witness in the 1962 trial. Perhaps because Black testified about an earlier period, the jury must have disregarded or discounted the bearing of his testimony about taxpayer's prior extensive sales campaigns with respect to his Pinellas County real estate.

Under Section 61 of the Internal Revenue Code of 1954, taxpayer was required to report as a part of his income all "Gains derived from dealings in property." Such gains are entitled to capital gain treatment if the profits are from the sale of capital assets. Under Section 1221(1) of the Code, property is excluded from the definition of a capital asset if it is "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Therefore, the jury issue here was whether the land sold in 1958–1963 was held by taxpayer as an investment or primarily for sale to customers in the ordinary course of his trade or business. In the leading case of Malat v. Riddell, 383 U.S. 569, 572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102, the Supreme Court explained that the purpose of Section 1221(1) of the Internal Revenue Code of 1954 was to differentiate between profits and losses "arising from the everyday operation of a business" and "the realization of appreciation in value accrued over a substantial period of time." The Court rejected the Government's view that "primarily" means a "substantial" purpose and instead held it means "of first importance" or "principally."[2] In the present case, applying the Malat test, the jury in effect concluded that except in 1959, taxpayer's gains did not arise "from the everyday operation of a business." The Government apparently recognizes that this type of case is largely factual (Nadalin v. United States, 364 F.2d 431, 439, 176 Ct.Cl. 1032 (1966)) and does not claim that the jury's adverse verdicts as to the five

taxable years lost by the Government were unsupported by the evidence. Instead, it has launched a highly technical attack on certain of the instructions to the jury and has charged that the trial court erroneously applied the collateral estoppel doctrine.

*Instructions*

▮ The Government does not quarrel with most of taxpayer's instruction No. 10(3) telling the jury that one of the factors to be considered in determining whether the plaintiff's land was held primarily for investment or for sale to customers in the ordinary course of a trade or business was the frequency and continuity and number of plaintiff's properties sold in each year involved in the lawsuit. However, the Government objects to an addendum to this instruction that the jury should consider the sales activity "in relation to his [taxpayer's] total holdings." In Chandler v. United States, 226 F.2d 403, 404 (7th Cir. 1955), we noted that of an original holding of a million acres of Texas land, taxpayers had engaged in 536 separate sales transactions in selling 290,000 acres for $5,000,000 in the taxable years involved. This Court stated (at page 406):

> "But the market place is hardly glutted with prospective buyers clamoring for million acre tracts. It seems odd to penalize this taxpayer because it actively sought to dispose of these holdings. Defendant would insist that [taxpayer] *Capitol sit idle, wishing* for a buyer or buyers, under the threat that any selling effort would result in deprivation of capital asset treatment."

Similarly, in Goldberg v. Commissioner of Internal Revenue, 223 F.2d 709, 712, 713 (5th Cir. 1955), the Fifth Circuit, reversing a Tax Court decision that houses sold were held for sale to customers in the ordinary course of trade or

---

2. This test is akin to the dominant motivation test just adopted by the Supreme Court as to whether a bad debt is a business or nonbusiness obligation. United

States v. Genares, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62; see also Niblock v. Commissioner of Internal Revenue, 417 F.2d 1185 (7th Cir. 1969).

business, adverted to the number of units in the entire project and mentioned that the project was a large one. Thus of the 111 housing units, the court noted that only 2 had been sold in 1943 and 2 in 1944, and only 17 in 1945, although 90 were sold in 1946, the taxable year. 223 F.2d at 711. On the other hand, we agree with the Government that the retention of massive holdings by large-scale real estate operators of course does not insure capital gains treatment for the tracts sold. But we cannot say that the seven factors[3] admittedly properly embodied in instruction 10 were fatally infected by the explanatory comment as to the third factor that the jury should consider the frequency, continuity and number of taxpayer's sales "in relation to his total holdings," particularly since the judge told the jury that "No single one of the [seven] factors outlined, standing alone, is controlling * * *."

■ The Government next complains that in instruction 10(3) the trial court told the jury to consider "the frequency and continuity and number of plaintiff's properties *sold in each year involved in this lawsuit*" when determining whether plaintiff's land was held primarily for investment or for sale to customers in the ordinary course of trade or business (emphasis supplied). The Government complains that the jury should have been permitted to consider sales in prior years. However, no objection was made to this portion of instruction 10(3), so that we may not now consider it. Fed. R.Civ.Proc. 51. Moreover, the instruction did not confine the jury to the taxable years, and indeed the Government was permitted to introduce pertinent evidence with respect to the five years immediately preceding the years in suit.

■ The Government also asserts that the district court should have given the jury the following instruction:

"In determining whether the sales activity over a period of time was con-tinuous, you may look not only to the sales made during the years in question, namely, 1958 through 1963, but also to the sales made in the prior years, namely, 1948 through 1957." However, that instruction assumes that there was "sales activity" on the part of the taxpayer and was therefore improper.

■■ In instruction 10 as to whether the plaintiff's land was held primarily for sale to customers in the ordinary course of trade or business, the fourth factor submitted for the jury's consideration was "whether the plaintiff replaced the property sold with additional and continuing purchases of real estate." As to this factor, the court gave an explanatory comment that the jury "should consider the frequency and continuity of plaintiff's purchases of property during the years in question in relation to his sales during those years * * *." The Government complains that the court should have added to this instruction that "A taxpayer may hold enough land to do a large business without having to buy any more." The suggested addition implies taxpayer's land holdings alone might constitute business activity. Furthermore, the size of the business is insufficient to transfer a taxpayer's land activities into a business. See Chandler v. United States, 226 F.2d 403, 406 (7th Cir. 1955). Therefore, it was unnecessary to add the sentence requested by the Government.

■ The Government's last complaint about instructions is the court's failure to give the following portion of its requested instruction 18:

"Where there is a seller's market, that is where purchasers seek out the seller, it is not essential that active sales promotion be demonstrated in order to prove that the plaintiff is engaged in the business of selling real estate."

It is true that where other factors cumulatively demonstrate that a taxpayer

---

3. See note 4 *infra*.

is engaged in the business of selling real estate, the absence of sales promotional activity due to the existence of a seller's market will not overcome the thrust of the other indicators. Patrick v. Commissioner of Internal Revenue, 275 F.2d 437, 439 (7th Cir. 1960). On the other hand, where other factors indicate that real estate is held primarily for investment purposes, the absence of any need to advertise and solicit purchases because of the market condition will not rebut the investment-holding conclusion. Scheuber v. Commissioner of Internal Revenue, 371 F.2d 996, 998–999 (7th Cir. 1967). These statements are simply corollaries of the principle that of the seven relevant factors, no single one is controlling. Patrick v. Commissioner of Internal Revenue, *supra;* Scheuber v. Commissioner of Internal Revenue, *supra,* 371 F.2d at 998. The fifth factor given for the jury's consideration in instruction 10 was "the extent of the sales, development and promotional activity of the plaintiff." [4] Later in instruction 10 the trial court told the jury that "No single one of the factors outlined, standing alone, is controlling in determining whether the property was held as a capital asset and was being liquidated at the time of sale, or was being held primarily for sale to customers in the ordinary course of the trade or business of selling real estate." This states and satisfies the law. The requested instruction 18 is superfluous and in its superfluity, as well as in its phraseology, it tends to give undue significance to the existence of a seller's market, over which the taxpayer had no control. Therefore, it was properly rejected.

Despite the fact that we might have initially ruled differently than the trial judge with respect to the instructions, our study of the instructions as a whole reveals that the jury was properly told to consider appropriate factors in determining if the gains were from a business or from long-term appreciation, and

that no one factor was controlling. This was sufficient. See 3B Mertens, Law of Federal Income Taxation, § 22.15. The fact that the jury found for the Government in 1959 tends to indicate that the instructions as a whole were fair to the Government, and more is not required. Garrett v. Campbell, 360 F.2d 382, 386 (5th Cir. 1956).

*Collateral Estoppel*

■ Over the Government's objection that it was irrelevant and immaterial, taxpayer was permitted to introduce a certified copy of the judgment and pleadings in the 1962 case in which a jury had found that in 1951 and 1952 his Florida property was not held primarily for sale to customers in the ordinary course of business. The Government cannot seriously argue that information as to the sales in 1951 and 1952 was irrelevant and immaterial, for the Government itself succeeded in introducing evidence as to like sales from 1953 to 1957. The trial court subsequently instructed the jury that the 1962 jury verdict favoring taxpayer as to the years 1951 and 1952 was "a factor you may take into consideration in determining whether the plaintiffs [taxpayer] held the property sold in the years 1958–1963 as a long-term investment or held primarily for sale to customers." Obviously the jury did not feel boxed in by this instruction, for it found for the Government in 1959. Nevertheless, the Government asserts that this instruction on the 1962 judgment that was admitted into evidence amounted to the improper imposition of the doctrine of collateral estoppel against it as to the taxable years 1958–1963. Collateral estoppel was not really involved since the prior judgment foreclosed no litigable issue in this case and the relevant facts are separable. Commissioner of Internal Revenue, v. Sunnen, 333 U.S. 591, 601, 68 S. Ct. 715, 92 L.Ed. 898; Jackson v. King, 223 F.2d 714, 718–719 (5th Cir. 1955).

---

4. The fifth factor, together with the court's explanatory comment, covered two different activities, *viz.* (1) developments and improvements and (2) advertising and selling activities, thus presenting seven factors in all to the jury.

The question is one of the probative significance of the judgment. The trial judge instructed the jury that the 1962 determination was merely "a factor" to consider in its deliberations as to 1958–1963.[5] This was appropriate, for even the Government concedes that the 1962 judgment represented a final determination of the fact that the 48 lots sold in 1951 and the 74 lots sold in 1952 were not held primarily for sale to customers in the ordinary course of business. In making its decision as to 1958 and subsequent years, the jury could properly start with the proposition that the taxpayer held lots sold in 1951 and 1952 as an investment. See Thomas v. Commissioner of Internal Revenue, 324 F.2d 798, 799–800 (5th Cir. 1963); Ryman v. Tomlinson, 56–2 USTC ¶ 9741 (S.D.Fla. 1956); Fritz v. Thompson, 38 T.C. 153, 164–166, affirmed, 323 F.2d 122 (5th Cir. 1963); see also Kortz v. Guardian Life Ins. Co., 144 F.2d 676, 678 (10th Cir.), certiorari denied, 323 U.S. 728, 65 S.Ct. 63, 89 L.Ed. 584 (1944). Additionally, the Government in effect complains of a double standard because the trial court refused to admit proffered evidence as to the level of taxpayer's sales activity in years prior to 1952. But the ground of remoteness justified the trial court's refusal to receive evidence as to the taxpayer's sales activities for the years 1948–1952.

*Taxable Year 1959*

■ Taxpayer argues that the jury verdict may not stand in favor of the Government as to his gains in 1959. However, the jury would be justified in considering that the number of lots sold and the number of transactions were much higher in 1959 than in the other years in question. The profit was higher than in any year except 1962, which involved only 7 lots, 5 transactions and 3 parcels. See Table *supra*. Even a witness for the taxpayer agreed that a seller's market existed during 1959, thus making extensive advertising unnecessary in that year. Moreover, the Government submitted impeachment evidence showing unreported and under-reported 1959 income as to four deeds, possibly totalling as much as $30,800. In our view, the evidence as to 1959, together with all reasonable inferences which might be drawn therefrom, when viewed in the light most favorable to the Government, warranted submission of the case to the jury. Therefore, the jury verdict may not be disturbed. Appleman v. United States, 338 F.2d 729, 730 (7th Cir. 1964). Since the Government has not shown that the verdict as to 1959 represents a compromise, we would not be warranted in setting it aside on such speculation. Cf. National Fire Ins. Co. of Hartford v. Great Lakes Warehouse Corp., 261 F.2d 35, 38 (7th Cir. 1958); 6A Moore's Federal Practice, ¶ 59.08[4] pp. 3793–3794.

The judgment for all six taxable years is affirmed, each party to bear its own costs.[6]

---

5. Therefore, there was no conflict with The Evergreens v. Nunan, 141 F.2d 927, 931 (2d Cir. 1944), where Judge Learned Hand observed that "no fact decided in the first [suit] * * * conclusively establishes * * * anything except a fact 'ultimate' in that [second] suit."

6. Although taxpayer prevailed as to five years, the Government prevailed as to 1959, one of the two significant years. In such circumstances, it would be inappropriate to disturb the trial court's discretion in taxing costs. See 6 Moore's Federal Practice, ¶ 54.70[4] and [5].