Jay CARTER; Joan H. Carter,
Plaintiffs–Appellants,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 90–16683.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 16, 1992.

Decided Sept. 1, 1992.

Edward O.C. Ord, Ord & Norman, San Francisco, Cal., for plaintiffs-appellants.

Paula K. Speck, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before: TANG, PREGERSON, and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

Jay and Joan Carter appeal the entry of summary judgment against them in their tax refund suit challenging the Internal Revenue Service's disallowance of a deduction for charitable contributions in 1983. We affirm the district court's denial of the Carters' summary judgment motion, but reverse its grant of the IRS's summary judgment motion and remand for trial.

## BACKGROUND

The Carters founded the Psychal Physionic Universal Life Church (PPULC) in 1975 after being ordained ministers in the Universal Life Church, Inc. of Modesto (ULC). They organized a congregation, affiliated their church with the ULC, and opened a church bank account on which the Carters were the sole signatories. Jay Carter became a full-time minister and does not hold any other employment. In lieu of a salary Jay receives a parsonage allowance, which is not taxable as income when paid to members of the clergy. *See* 26 U.S.C. § 107. Joan Carter, who is employed, donates to the PPULC fifty percent of her income, the maximum deductible contribution to a qualifying religious organization. The donations are deposited into

the PPULC account and are used to pay the parsonage allowance (including mortgage payments, interest, taxes, utilities, and repairs on the house) and other expenses which the Carters characterize as exclusively church-related.

Beginning in 1976, the Carters claimed a charitable contribution deduction on their income tax returns for the 50 per cent of Joan's salary they donated to the PPULC. Their annual donations ranged from approximately $10,000 in 1976 to $21,350 in 1983. Each year the IRS has disallowed the deduction and the Carters have paid the disputed amount. In 1981, the Carters sued the government in federal district court for a tax refund for the years 1976, 1977, and 1978 (*Carter I*). In 1984, the case went to trial before a jury, and the jury returned a verdict in favor of the Carters. In 1982, the Carters sued in Tax Court for a tax refund for the years 1979, 1980, 1981, and 1982 (*Carter II*). The Tax Court dismissed the suit after the Carters failed to comply with a discovery order for PPULC bank records.

The Carters then brought the instant suit (*Carter III*) in federal district court, seeking a refund on their 1983 taxes for the amount of deficiency resulting from the IRS's disallowance of their 1983 contributions to PPULC and from the addition of a five percent negligence penalty. The district court entered judgment for the government on the parties' cross-motions for summary judgment. The Carters filed a motion to set aside, alter and/or amend the judgment pursuant to Fed.R.Civ.P. 59(e) and 60(b), along with supplemental declarations concerning the facts of their case. The district court denied the motion. The Carters now timely appeal the judgment and the denial of their motion to set aside, alter and/or amend the judgment.

## DISCUSSION

In *Carter III* the Carters moved for summary judgment, arguing that the *Carter I* verdict and judgment collaterally estopped the government from relitigating their entitlement to a charitable contribution deduction. The government also moved for summary judgment, arguing that *Carter I* had no preclusive effect and that the undisputed facts demonstrated that the Carters were not entitled to the deduction. In granting the government's summary judgment motion, the district court determined that collateral estoppel was unavailable as a matter of law. The court also ruled that the Carters had failed to raise a material dispute concerning their fulfillment of two requirements for the deduction: whether they had made a bona fide gift and whether no PPULC earnings inured to their personal benefit. We agree with the district court that the *Carter I* judgment does not have collateral estoppel effect. Yet we also conclude that the *Carter I* judgment, along with the Carters' affidavit that all of their procedures, types of expenditures and church activities remain unchanged, were sufficient to raise a material dispute as to the Carters' entitlement to the deduction in 1983.

### I. *Collateral Estoppel*

Under the doctrine of collateral estoppel, once an issue is actually litigated and necessarily determined, that determination is conclusive in subsequent suits alleging different claims between the same parties. *See Montana v. United States*, 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979). The availability of collateral estoppel is a mixed question of law and fact in which legal issues predominate, and our review is de novo. *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1519 (9th Cir.1985).

Collateral estoppel principles apply in the income tax context to preclude the relitigation, in a proceeding concerning a later tax year, of any matters that were actually presented and determined in a suit concerning an earlier tax year. *See Peck v. Commissioner*, 904 F.2d 525, 527 (9th Cir. 1990). Several limitations apply. First, collateral estoppel is unwarranted if there has been a "significant 'change in the legal climate.'" *Id.* (citing *Montana*, 440 U.S. at 161, 99 S.Ct. at 977). Second, the doctrine is inapplicable if the legally controlling facts—those facts essential to the pri-

or judgment—have changed. *See Montana*, 440 U.S. at 159, 99 S.Ct. at 966; *Commissioner v. Sunnen*, 333 U.S. 591, 601, 68 S.Ct. 715, 721, 92 L.Ed. 898 (1948).[1] Third, in cases where the tax judgment sought to be applied preclusively results from a jury verdict, we have declined to give the judgment preclusive effect if new evidentiary facts exist which, although not themselves controlling facts, change the complexion of the controlling facts presented to the jury in the prior proceeding. *See Parker v. Westover*, 221 F.2d 603, 606 (9th Cir.1955). In such cases, "[t]he possibility of a different verdict because of the introduction of evidentiary facts different from those before a court and jury in a prior case is sufficient to surmount the danger of collateral estoppel in an income tax situation." *Id.*

▇ Since *Carter I*, a legal development has occurred concerning the tax status of the Universal Life Church, and this development significantly changes the complexion of the basic facts presented to the jury in *Carter I*. In 1984, the Internal Revenue Service (IRS) revoked the ULC's tax exempt status as a corporation organized and operated exclusively for religious purposes, for the fiscal years ending April 30, 1978, through April 30, 1981. That revocation has been upheld in the federal courts. *See Universal Life Church, Inc. v. United States*, 13 Cl.Ct. 567 (1987), *aff'd* 862 F.2d 321 (Fed.Cir.1988).

In *Carter I*, the Carters relied substantially on the ULC's tax exempt status as support for their claimed entitlement to a deduction for a charitable contribution. They argued to the jury, both in their opening and closing statements, that the ULC is a bona fide religion, and that because the Carter's congregation and the ULC are "one church" the ULC's tax-exempt status extends to the PPULC. Thus, contributions the Carters deposited into the PPULC account, they stated, belong to the ULC and the Carters were entitled to a deduction for those monies.

Each of the Carters' eight witnesses, including the Carters themselves, testified at length to the relationship between the ULC and its member congregations, and about the ULC's tax exempt status. Three of these witnesses were officials of the Universal Life Church. Reverend Kirby Hensley, the founder and president of the ULC, testified that member congregations are one with the ULC and that contributions deposited into the accounts of the member congregations belong to the ULC. Robert Imbeau also testified. Imbeau is a ULC minister and a member of the ULC Board of Directors, whose duties are to oversee and maintain the records of the various ULC congregations. Imbeau testified that because the congregations and the ULC "are one" they need not apply for their own tax exemption. Rebecca Cable, a ULC minister who serves as director of the ULC Ministerial Association and on the ULC Board of Directors and Advisory Board, testified extensively about the religious activities of the ULC. She also testified that contributions placed in congregations' bank

---

1. In this case we need not decide whether the "separable facts" doctrine announced in *Sunnen* remains viable in income tax cases. In *Sunnen*, the Court stated that collateral estoppel will not apply where the facts in the two proceedings are "separable," that is, when the cases do not "involve the same set of events or documents." *Sunnen*, 333 U.S. at 601–02, 68 S.Ct. at 721. Although the Court has repudiated the separable facts doctrine in general, it has also suggested that the doctrine may remain applicable to some extent in the income tax context. *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 172 n. 5, 104 S.Ct. 575, 579 n. 5, 78 L.Ed.2d 388 (1984). *See generally Peck*, 904 F.2d at 527–28 (discussing continued viability of *Sunnen*'s separable facts doctrine, without deciding question).

We read *Sunnen* and subsequent authority as indicating, however, that changes in facts between taxable years should receive close scrutiny. This reading is based on the policy considerations, first articulated in *Sunnen* and recently reaffirmed by the Court, which guide the application of collateral estoppel in the tax context. Collateral estoppel must be applied to avoid endowing taxpayers with perpetual, vested rights in a certain tax treatment, based on "decisions that have become obsolete or erroneous with time, thereby causing inequities among taxpayers." *Sunnen*, 333 U.S. at 599, 68 S.Ct. at 720; *see Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 363, 104 S.Ct. 1837, 1843, 80 L.Ed.2d 356 (1984) ("Failure to follow *Sunnen*'s dictates would lead to the very tax inequality that the

accounts "belonged to the Universal Life Church, and there was no question about that." All of the Carters' witnesses alluded to their dismay and sense of unfair treatment at the hands of the IRS, because even though the ULC was tax exempt the IRS had always disallowed deductions for contributions to the ULC and its member congregations.

The Carters argue that the revocation of the ULC's tax exemption has minor relevance because it was based on a "technicality" and because it does not relate to the 1983 tax year. We disagree. First, the exemption was not revoked on the basis of a technicality. The Claims Court found that the ULC gave tax advice and promoted tax avoidance among its congregations, and that this activity formed "more than an insubstantial part its activity," thus warranting revocation. *Universal Life Church*, 13 Cl.Ct. at 583. Evidence concerning these non-religious activities of the ULC was not before the jury in *Carter I*. Second, the revocation of the ULC's tax exempt status applied to more than half of the time period at issue in *Carter I*. Had the fact of the revocation been before the *Carter I* jury, the verdict may well have been different in light of the Carters' repeated emphasis on the ULC's exemption at trial. Because the revocation does not concern the tax year at issue here, does not mean this evidence is irrelevant to determining the Carters' entitlement to a deduction for 1983. In a new trial the parties may argue to a jury the significance of the revocation. *See Parker*, 221 F.2d at 606. In sum, we conclude that the new evidence concerning the ULC's tax status sufficiently changes the complexion of the controlling facts underlying the *Carter I* verdict so as to overcome the verdict's preclusive effect.[2]

## II. *Charitable Contribution Deduction*

■ We review *de novo* the district court's grant of the government's motion for summary judgment, viewing the evidence in the light most favorable to the Carters to determine whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. *See Tzung v. State Farm Fire and Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989). To establish their entitlement to a deduction for a charitable contribution, the Carters must show (1) they made a gift or contribution (2) to an organization established and operated solely for religious purposes (3) no part of whose net earnings inure to the benefit of any private individual. *See* 26 U.S.C. § 170(a), (c). They successfully met these requirements in *Carter I*, where the jury found on interrogatory that: (1) the Carters had made a bona fide gift or contribution to the PPULC; (2) the PPULC was organized and operated exclusively for religious purposes; and (3) no part of the PPULC's net earnings inured to the benefit of the Carters.

■ Although we concluded above that the *Carter I* verdict does not have preclusive effect because of new evidentiary facts concerning the ULC's tax exempt status, the findings it represents do have probative value for purposes of summary judgment. *See Koch v. United States*, 457 F.2d 230, 235–36 (7th Cir.1972) (prior jury verdict in taxpayer's favor properly admitted into evidence in trial concerning later tax year as probative evidence concerning character of similar transaction); *In re Hartman Material Handling Sys., Inc.*, 141 B.R. 802 (Bankr.S.D.N.Y.1992) (even though prior adjudication does not have collateral estoppel effect, its "findings should be given substantial deference"); *B.F. Sturtevant Co. v. United States*, 18 F.Supp. 28, 30 (D.Mass.1937) (although prior decision is not technically res judicata, it operates as prima facie evidence in later proceeding), *aff'd* 99 F.2d 72 (1st Cir.1938). Our analysis is thus whether *Carter I* is sufficiently probative of the issues presented in *Carter III* to raise material issues of

---

admonition of that case was designed to avoid.").

**2.** Because we conclude that collateral estoppel was unavailable on this ground, we do not con-

sider whether other grounds exist, such as whether the minor variation in the facts between the years at issue in *Carter I* and in *Carter III* constitutes a difference in the controlling facts.

fact as to each of the three requirements for the deduction and thereby to overcome the government's summary judgment motion. We discuss each requirement in turn.

## A. Contribution or Gift

The district court ruled as a matter of law that the Carters had not met the "contribution" requirement. It found that because the Carters retained sole signatory power over the PPULC account, they had not made a completed gift to the PPULC. The government argued the "sole control" theory in *Carter I*. The jury nevertheless found on interrogatory that the Carters had made a "bona fide gift or contribution" to PPULC in 1976, 1977, and 1978. Evidence submitted at that trial included evidence that a third trustee participated in annual authorizations of funding for the Carters' ministry. In an affidavit supporting their summary judgment motion the Carters asserted that, other than the amounts involved, none of the facts concerning their accounting and payment procedures, their donations, and their donative intent had changed from the years at issue in *Carter I* to the year at issue in *Carter III*.

We do not agree with the government that the facts or the law have changed sufficiently to warrant discarding the jury's finding that the Carters' made a bona fide gift or contribution. The government first argues that the "legal climate" has changed since *Carter I*, pointing to three recent cases holding that when the charitable donor retains sole signatory power over a contribution the donor is not entitled to a deduction because the gift has not been completed. *See, e.g., Burke v. United States*, 88–1 U.S. Tax Cas. (CCH) ¶ 9291, 83,784–75, 1988 WL 68048 (D.Conn. 1988); *Gookin v. United States*, 707 F.Supp. 1156, 1158–59 (N.D.Cal.1988); *Davis v. Commissioner*, 81 T.C. 806, 816–17 (1983), *aff'd*, 767 F.2d 931 (9th Cir.1985). None of these cases, however, involves the effect of the presence of an outside trustee

or board of directors on the issue of whether sole control has been relinquished sufficiently to result in a completed gift. Moreover, this legal authority does not represent a changed legal climate because the rule was an established one at the time of the *Carter I* trial. *See Pauley v. United States*, 459 F.2d 624, 627 & n. 8 (9th Cir. 1972) (citing cases). Indeed, *Davis* was decided a year before the *Carter I* trial.

The government next points to bank records, not available in *Carter I*, which show that the Carters were the sole signatories on the PPULC account in 1983.[3] This fact, however, is not new. Joan Carter testified in the *Carter I* trial that the Carters had sole signatory power over the PPULC account. Finally, the government argues that the Carters failed to make a showing that a third trustee was involved in the disbursement of PPULC funds in 1983, while in *Carter I* testimony was presented concerning a third trustee's participation in yearly authorizations of the parsonage allowance. Again, we disagree. We must make inferences on this issue in the Carter's favor when considering the government's motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). The Carter's affidavit that none of their procedures have changed since the years at issue in *Carter I* was sufficient to put into dispute facts surrounding the Carter's control, *i.e.*, whether a third trustee is still involved and the extent of that involvement. Accordingly, we conclude that whether the Carters had made a completed gift or contribution was not an issue appropriate for summary adjudication.

## B. Entity organized and operated for exclusively religious purposes

In *Carter I* the Carters testified extensively about their religious beliefs and

---

**3.** The Carters argue that this evidence should have been disregarded for summary judgment purposes because these records, as well as the transcript of their joint deposition filed by the government, were not properly authenticated.

This is a specious argument, for although the government originally filed this evidence without authentication, it did authenticate it properly in advance of the hearing on summary judgment.

activities, and the jury found that the PPULC was organized and operated exclusively for religious purposes. The issue is whether the relevant facts at issue in *Carter III* are sufficiently similar to those presented to the jury in *Carter I* to raise a material dispute over the PPULC's religious purposes in 1983. The government argues that unlike the evidence in *Carter I*, the evidence in *Carter III* shows that "nontrivial" amounts of PPULC funds were used for the Carters' personal benefit, without any link to religious purposes. Thus, the government reasons, the Carters as a matter of law fail the "exclusively religious purposes" requirement. We disagree. Nonsubstantial or incidental nonreligious activities will not disqualify an organization from the exemption. *See Universal Life Church*, 13 Cl.Ct. at 583; *see also Better Business Bureau v. United States*, 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945) ("[A] single noneducational purpose, *if substantial in nature*, will destroy the exemption...." (emphasis added)).

The *Carter I* jury approved a parsonage allowance, which included rent or mortgage, taxes, utilities, insurance, repairs, and maintenance. It also approved as church-related church car expenses and restaurant meals for church meetings. The 1983 PPULC expenditures at issue in *Carter III* are almost exclusively for similar purposes. The remaining types of expenses which were not explicitly involved in *Carter I* total less than $700,[4] and are not substantial enough, given total 1983 expenses of $25,455, or sufficiently proven to be nonchurch-related to establish as a matter of law that PPULC was not operated for exclusively religious purposes.

▆▆▆ Nor do we consider the revocation of the ULC's tax exempt status sufficient to resolve this issue as a matter of law. As we concluded above, it is possible that the *Carter I* jury relied in part on ULC's

tax exempt status in reaching its verdict, because substantial evidence was introduced about ULC charitable activities and tax exempt status. However, the trial also focused extensively on the Carters' own religious activities and motivations. The Carters testified about their own beliefs and purposes, and the verdict reflects the jury's determination that their beliefs are sincere. Moreover, the jury instructions and verdict dealt only with PPULC's qualification as an exempt organization. Therefore, although the revocation of the ULC's tax exempt status may have affected the verdict, the jury's finding that the PPULC is an organization operated solely for religious purposes was sufficiently probative to raise a material dispute and preclude summary judgment for the government on this basis.

**C. Personal Inurement**

Personal inurement formed a second, alternative basis for the district court's grant of summary judgment for the government. It found that many of the expenditures reflected in the Carters' bank records were personal living expenses which inured to the Carters' personal benefit. The court pointed specifically to expenses not involved in *Carter I:* a magazine subscription, medical services, and liquor bills. The evidence the Carters submitted regarding these and other expenses consisted of the following statement in their affidavit: "[T]he parsonage allowance [and] church expenses ... remain the same for the year 1983 [as in the years at issue in *Carter I*].... Only the amounts differ."

▆▆▆ To qualify as a charitable contribution, a donation must be given to an organization in which "no part of the *net earnings* ... inures to the benefit of any private ... individual." 26 U.S.C. § 170(c)(2)(C) (emphasis added). Assuming without deciding that *de minimis* personal benefits can disqualify a deduction,[5] we

---

**4.** Medical expenses for the Carters, $395; life insurance with PPULC as beneficiary, $164; magazine subscription, $15; and wine store bills, $108.

**5.** In *Gookin*, 707 F.Supp. at 1158, the district court interpreted this provision of the Internal Revenue Code to provide that "any inurement, however small the benefit to the individual, is impermissible." We have grave doubts that the

conclude that the government has failed to establish as a matter of law that part of the PPULC's net earnings inured to the Carters' private benefit.

 We must first determine which earnings to examine for personal inurement. The Carters argue that because PPULC had no net earnings, *i.e.*, money left after expenses were paid, there could be no personal inurement. This is an overly simplistic interpretation of net earnings; so too is the government's contention that net earnings equal gross earnings for purposes of the deduction. Courts have defined "net earnings" fairly broadly, *Hall v. Commissioner*, 729 F.2d 632, 634 (9th Cir. 1984), to signify funds used for expenses over and above expenses that are "ordinary and necessary" in the operation of a religious organization. *See Founding Church of Scientology v. United States*, 188 Ct.Cl. 490, 412 F.2d 1197, 1200–01 (1969), *cert. denied*, 397 U.S. 1009, 90 S.Ct. 1237, 25 L.Ed.2d 422 (1970). Thus, the dispositive question is whether the expense involved is ordinary and necessary. If it is, its payment to a private individual does not constitute personal inurement. If the expense is not ordinary and necessary, it may or may not constitute personal inurement.

 Reasonable salaries are considered "ordinary and necessary expenses" of a tax-exempt organization; however, excessive salaries constitute personal inurement to employees. *Founding Church*, 412 F.2d at 1200. In *Founding Church*, for example, the court found personal inurement in salary, commissions, royalties, and unexplained loan repayments and expense reimbursement, because the facts

suggested this compensation "was not for full-time service" and was not "properly attributable ... as income." *Id.* at 1201. Here, in lieu of a salary, Jay Carter received a parsonage allowance for his undisputed full-time service as a minister. Excessive parsonage allowances may also constitute personal inurement. *Hall*, 729 F.2d at 634. Jay Carter's parsonage allowance, however, is not excessive as a matter of law: he was not otherwise employed, and his 1983 allowance totalled just over $15,-000.

Nor do we find that expenditures for a life insurance policy naming PPULC as a beneficiary and medical expenses for the Carters constitute personal inurement as a matter of law. The beneficiary of the insurance policy was the PPULC and not the Carters personally. Moreover, medical insurance is a typical "ordinary and necessary" expense of a tax-exempt employer. *Cf. Brian Ruud Int'l v. United States*, 733 F.Supp. 396, 400–01 (D.D.C.1989) (church's payment of medical expenses for minister and family does not constitute personal inurement).

The *Carter I* jury found no personal inurement in the parsonage allowance, as well as other PPULC expenditures such as those connected with the church car, restaurant meals, supplies for in-home religious services, and credit card reimbursements for nonspecific church-related expenses. Moreover, we consider the "new" 1983 expenses—which the government argues demonstrate personal inurement—to be of the same type as expenses for which the *Carter I* jury found no personal inurement.[6] This finding concerning expenses

de minimis doctrine, which is so generally applicable, would not apply in this situation. *See, e.g., Texas State Teachers Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782, 792, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989) (civil rights plaintiff not a prevailing party for purposes of an award of attorneys fees under 42 U.S.C. § 1988 where success is technical or *de minimis*); *Withrow v. Concannon*, 942 F.2d 1385, 1388 (9th Cir.1991) (only if state's noncompliance with statutorily prescribed time periods for administrative action is *de minimis* does court have discretion not to issue injunction); *United States v. Johns*, 891 F.2d 243, 245 (9th Cir.1989) (if role of illegally obtained leads in discovery

of evidence is *de minimis*, suppression is inappropriate); *Lindow v. United States*, 738 F.2d 1057, 1062–63 (9th Cir.1984) (*de minimis* rule applies in relation to total sum involved in litigation, precluding overtime compensation recovery for tasks otherwise compensable under Fair Labor Standards Act where time spent on tasks is *de minimis*).

6. Making all reasonable inferences in the Carters' favor, for example, the parsonage allowance approved in *Carter I* would include rent, moving and storage, plumbing, garbage, utilities, water, insurance, repairs, maintenance,

substantially similar to those in 1983 is probative here. We simply do not accept the government's argument that the presence of such "new" expenses as a single magazine subscription establishes personal inurement beyond dispute. We therefore conclude that personal inurement was a material issue of fact for the jury.

Were we free to assume that this case is just like the many cases in which ULC contributions have been disallowed as invalid tax shelters for ULC ministers, we might more readily agree with the district court that the Carters' deduction should be disallowed as a matter of law. We must examine each case on its individual facts, however. The *Carter I* verdict, which approved substantially similar activities, expenses, and procedures, represents a credibility determination and a finding of the validity of the Carter's religious enterprise which should not be discarded lightly. Thus, we conclude that material facts concerning the Carters' entitlement to a deduction for their 1983 contribution to the PPULC remain disputed. The Carters are entitled to have their claims tried and evaluated by a jury.

## III. *Negligence Penalty*

The district court affirmed the five percent negligence penalty imposed on the Carters for claiming a religious contribution deduction on their 1983 tax return. The version of the Tax Code applicable to the Carters' 1983 tax return provides for a penalty of five percent of any underpayment of tax where the underpayment "is due to negligence or intentional disregard of rules or regulations (but without intent to defraud)." 26 U.S.C. § 6653(a) (1982). Because we remand for trial on whether the Carters properly claimed the deduction

and cable assessment. Church car expenses, approved in *Carter I,* would include expenses at issue here: repairs, gas, license, upholstery, storage for the church car, one of the two cars the Carters owned. Church supplies, for which the *Carter I* jury found no personal inurement, would include wine for sacramental purposes and a magazine subscription for the waiting room. The credit card bills are somewhat more problematic. The Carters testified about their practice of using credit cards in *Carter I,* and

on their 1983 taxes, we reverse the imposition of the penalty. The propriety of the penalty may be reconsidered in light of the facts developed at trial.

## IV. *Motion to Set Aside, Alter or Amend Judgment*

The district court entered judgment for the government in this case on September 10, 1990. A copy of the judgment was sent to the Carters' previous attorney but the Carters' new attorney did not receive a copy, even though the court was on notice of the substitution. On October 16, 1990, upon learning of the entry of judgment, the Carters' new attorney filed a motion to set aside, alter and/or amend the judgment pursuant to Fed.R.Civ.P. 59(e) and 60(b). In the motion, the Carters asked the court not only to vacate the judgment for the government, but to enter judgment for the Carters. The district court denied the motion.

▮▮▮▮ Although we reverse the grant of summary judgment for the government herein, the propriety of the district court's denial of the post-trial motion is nevertheless before us inasmuch as we also affirm the denial of the Carters' summary judgment motion. We review the district court's denial of the post-judgment rule 59(e) and 60(b) motion for abuse of discretion. *Fiester v. Turner,* 783 F.2d 1474, 1475–76 (9th Cir.1986). The court denied the motion to the extent it sought relief under rule 59(e) because of its untimeliness. Because the district court has no discretion to consider a late rule 59(e) motion, there was no abuse of discretion here. *See* Fed.R.Civ.P. 60(b); *Browder v. Director, Dep't of Corrections,* 434 U.S. 257, 261–62 n. 5, 98 S.Ct. 556, 560 n. 5, 54 L.Ed.2d 521 (1978).

the jury found no personal inurement because it believed the Carters' assertion that these expenses were exclusively church-related. In *Carter III,* the Carters did not explain miscellaneous credit card expenses at their deposition, but included them in the breakdown of church-related expenditures in their joint declaration filed in opposition to the government's summary judgment motion. There is a triable issue whether these credit-card expenses are church related.

The district court denied the motion pursuant to rule 60(b) on the merits, rejecting the Carters' arguments that setting aside the judgment was justified because of misrepresentation, newly discovered evidence, and mistake. The court concluded that the government had made no misrepresentations material to the judgment, that the Carters had presented no new evidence that was not discoverable earlier, and that the court's mistake in failing to mail the Carters' new attorney a copy of the judgment did not justify setting aside the judgment. We find no abuse of discretion in denying post-judgment relief based on these conclusions, and we therefore affirm this decision.

### V. IRS Harassment in Violation of First and Fourteenth Amendments

The Carters argue that the government's disallowance of their 1983 religious contributions violated the Constitution because it ignored the *Carter I* jury determination that PPULC was a bona fide religious organization and that the contributions to it were proper. As we discussed above, the *Carter I* verdict does not collaterally estop the government from denying the deduction. We recognize that the government's power to require taxpayers such as the Carters to litigate anew each year their entitlement to deductions for religious contributions is certainly subject to abuse and may in some cases constitute unlawful harassment. It does not rise to such a level here.

### VI. Attorney's Fees and Rule 11 Sanctions

The Carters ask that we award them attorney's fees under the Equal Access to Justice Act (EAJA) and impose sanctions on the government under Fed. R.Civ.P. 11. Attorney's fees are available under the EAJA for parties prevailing in actions against the government where the government's position both in the conduct at issue and in subsequent legal proceedings is not substantially justified. 28 U.S.C. § 2412(d). Because the merits of the Carters' claim against the government have yet to be determined, they are not considered "prevailing parties" and any EAJA award would be premature at this time.

Rule 11 requires imposition of sanctions if legal papers are filed for an improper purpose "such as to harass or to cause unnecessary delay." Fed.R.Civ.P. 11. The Carters sued the government, and the papers filed by the government in its defense did not in themselves constitute harassment or cause unnecessary delay. Therefore, Rule 11 sanctions are inappropriate.

### CONCLUSION

The district court properly denied the Carters' summary judgment motion, because collateral estoppel based on the *Carter I* verdict is unavailable in light of subsequent developments concerning the ULC's tax exempt status. Even though the *Carter I* verdict falls short of being preclusive, together with the Carters' general assertion that their procedures, expenses, and activities have not changed in substantive ways and in the absence of evidence to the contrary, it does operate to raise a material dispute as to the Carters' entitlement to a charitable contribution deduction for 1983. Thus, we reverse the summary judgment for the government. We affirm in all other respects.

REVERSED and REMANDED.

TANG, Circuit Judge, Concurring in Part and Dissenting in Part:

I concur in the judgment and in almost all aspects of the majority's opinion. I dissent only from the discussion contained in footnote 5 of the opinion. Although it is not necessary to the court's decision and is therefore dicta and not binding on either this court or the district courts, the majority goes out of its way to criticize *Gookin v. United States*, 707 F.Supp. 1156, 1158 (N.D.Cal.1988), which holds that any personal inurement can erase a contribution's status as charitable for purposes of the tax law.

The majority and I undoubtedly agree that such a draconian rule might not be fair or good policy. But where is it written that the internal revenue laws must comport with individual judges' notions of propriety and practicality? An argument certainly could be made for requiring a no inurement bright line rule in deciding what qualifies for tax exempt status. Otherwise, the Internal Revenue Service is confronted with the task of deciding on a case-by-case basis how much profiteering is tolerable and when personal inurement crosses the line from de minimis to significant. Insisting, as the majority does, that the Internal Revenue Service must allow personal inurement to some extent opens a Pandora's Box. At a minimum, I would prefer that this court withhold comment on the legality of an absolute no inurement rule until the issue is squarely presented in a case and its implications fully briefed and argued.